UNITED STATES *v.* FISH.

*(Circuit Court, S. D. New York. June 26, 1885.)*

1. NATIONAL BANKS—REV. ST. § 5209—MISAPPROPRIATION OF FUNDS.

The misappropriation of the funds of a national bank by an officer in the honest exercise of official discretion, in good faith, without fraud, for the advantage, or supposed advantage, of the bank, is not punishable; but if official action be taken, not in the honest exercise of discretion, in bad faith, for personal advantage, and with fraudulent intent, it is punishable.

2. SAME—LOAN MADE IN GOOD FAITH.

So far as the question of guilt or innocence of an officer under the statute is concerned, there is no distinction between a loan in bad faith for the purpose of defrauding the bank, and an application of money with like intent in a form other than a loan.

3. SAME—LOAN, WHEN MISAPPLICATION OF FUNDS.

A known abuse by an officer of discretionary power in making a series of loans which it is known the directors would not sanction, will constitute a criminal misapplication of funds of the bank, if done in bad faith, for private gain, and not in the exercise of honest judgment.

4. SAME—FALSE CREDITS.

Where an officer of the bank makes false credits in favor or a firm of which he is a member, and causes the money represented by such credits to be paid to his firm by being drawn out of the bank by his partner in pursuance of an understanding had with him that the money should be so drawn, the credit having been made for that purpose, he will be guilty of a violation of the statute.

5. SAME—PERSONAL TAKING OF MONEY.

It is not necessary to show that the officer personally took any money from the bank, or was personally present when any other person took away money, to render him criminally liable.

6. SAME—CREDIT OF GREATER SUM THAN CHARGED NOT A VARIANCE.

Where a count in an indictment charges an officer of a national bank with

having misapplied $25,000 of the money of the bank, "by causing the said sum of $25,000 to be credited to G. & W. on the books of the bank," etc., and the evidence shows a credit by a single entry of $105,000, $25,000 of which the jury found was a misapplication, *held*, not a material variance, and that he may be convicted on that count. BROWN, J., dissenting.

7. SAME — ALLOWING PARTNERS TO OVERDRAW ACCOUNT WITH INTENT TO DEFRAUD BANK.

Where an officer of a national bank, with an intent to defraud the bank, allows a firm, of which he is a member, to overdraw its account, he is guilty of a misapplication of the moneys of the bank, within the meaning of Rev. St. § 5209.

Motion for New Trial.

*Elihu Root*, U. S. Atty., for the United States.

*Stanley, Clarke & Smith*, for defendant.

Heard by WALLACE, BENEDICT, and BROWN, JJ.

BENEDICT, J. The defendant was indicted under section 5209 of the Revised Statutes. Having been convicted, he moved for a new trial. His motion has been heard before the three judges, and is now to be decided. The indictment contains 25 counts, upon 11 of which there was a conviction. Of these counts, the first, the fourth, and the twenty-second, each charges a separate misapplication of the money of the Marine National Banking Association by the defendant, who was president of the association. The remaining eight counts contain charges of making false entries in the books of the association. Of these, the eleventh and twelfth relate to the same entry: one count charging the entry as made with intent to deceive the bank examiner; the other, charging the entry as made with intent to defraud the association. The same is true of counts 13 and 14.

The charge in the first count, in substance, is that on the fifteenth day of February, 1884, the accused, being the president of the association, with intent to injure and defraud the association, for the benefit of himself and one Ferdinand Ward, did misapply of the money of the association the sum of $25,000. The manner in which the misapplication was accomplished is stated substantially as follows: That the defendant, as president, caused to be credited on the books of the association, to the firm of Grant & Ward, of which the defendant and one Ferdinand Ward were members, the sum of $25,000, when the firm was not entitled to be credited with the same or any part thereof, as the defendant then knew; and thereby the defendant placed at the disposal and subject to the order of his firm the said sum of $25,000, fraudulently devising and intending to enable his firm to obtain and convert to its own use the sum of $25,000. And this sum thereafter, by reason of the said credit, that firm did draw from the money of the bank and convert to its own use. The fourth count charges the misapplication of $160,000 in a similar manner.

The twenty-second count charges the misapplication of $350,000 on the fifth day of May, 1884, accomplished by the defendant, as president, with intent to defraud the bank, causing to be paid to the firm of Grant & Ward, out of the money of the bank, $350,000 in

excess of the sums which the firm was entitled to draw and have paid, the defendant intending that the firm should appropriate to the use of that firm $350,000 of the money of the bank to which they had no right.

The objections taken to the conviction upon these counts will be first considered. In order to an understanding of these objections some of the facts proved must be stated. The accused was president of the Marine Bank, and also a member of the firm of Grant & Ward. Grant & Ward kept two accounts in the Marine Bank, one of which was known to the directors and appeared in the average balance book; the other was designated "Grant & Ward Special," and did not appear in the average balance book. A separate pass-book was kept for this special account, and most of the entries in this book were made by the accused. He also made most of the deposits to the credit of this account. The credits charged in the first and fourth counts were credits to this account, and were entered in the special pass-book by the accused himself.

From time to time Fish and Ward arranged between themselves to obtain money from the bank for the use of their firm, outside the firm loans and discounts which went before the directors and were credited to the general account, and then Ward would prepare a series of notes for $40,000 or less, amounting in the aggregate to the sum which Fish and Ward had arranged to obtain from the bank. These notes Ward procured to be signed by different persons,—Spencer, Armstrong, Doty, etc.,—who were clerks and messengers of Grant & Ward. The notes in form were ordinary stock notes. Each expressed a promise by the person whose name was signed to the note to pay the sum specified on demand, with interest at 6 per cent. per annum, to the Marine Bank, and recited that such person had deposited with the bank, as collateral security, bonds and stock described in the note. The notes thus procured were handed by Fish to Nathan Daboll, the assistant cashier of the bank, with a direction to enter up loans in conformity with the notes, and to credit the amounts to Grant & Ward, and in most instances Fish himself credited the amount in the special pass-book of Grant & Ward. Thereupon Daboll made in the loan and collateral book of the bank entries of loans to the signers of the notes, in conformity with the notes, the entries stating the maker of the notes as borrower, the time of the loan, and the deposit as collateral of the bonds and stock described in the stock note. A ticket for the amount was then prepared and signed by the cashier, the same being a direction to the note-teller to charge the sums specified in the ticket to loans, and to credit the same to Grant & Ward special. From the entries made in the note-teller's book in accordance with the ticket, the book-keeper, in the ordinary discharge of his duties, entered in the ledger a credit to the special account of Grant & Ward, and the sums were thereafter paid out on checks drawn by Grant & Ward.

By the indictment it was charged that the defendant was guilty of misapplying the moneys of the bank, because he, as president of the bank, with intent to defraud the bank, caused these sums to be credited on the books of the bank to his firm, knowing that his firm were not entitled to such credits, and the firm had drawn these sums from the bank when not entitled thereto. The defendant's answer was that his firm was entitled to have these sums credited, and to draw out these moneys, because he, in the exercise of his authority, as president of the bank, had loaned these sums to his firm.

Upon this motion it is first contended that the defendant was improperly convicted of misapplying these moneys, because what was done by him he did as president, and his acts, therefore, were mere maladministration. The decisions of the supreme court of the United States in the *Britton Cases* are cited as authority for this position. But the *Britton Cases* do not support this contention. In the *Britton Case,* reported in 107 U. S. 668, S. C. 2 Sup. Ct. Rep. 512, it is pointed out that an officer of a bank, having an intent to defraud the association, may by an official act misapply the moneys of the association, when the misapplication is not a mere application of the money for the benefit of the association to a purpose forbidden by law, but a criminal misapplication by which the association may be defrauded.

In the discount case, (108 U. S. 193, S. C. 2 Sup. Ct. Rep. 526,) attention is called to the omission from the indictment of an allegation that the discount was procured by fraudulent means, and the implication is that an official act done in bad faith, with intent to defraud the association, is punishable under section 5209. The conspiracy case (108 U. S. 199, S. C. 2 Sup. Ct. Rep. 531) contains nothing to the contrary of this. The proper conclusion to be drawn from the *Britton Cases,* taken together, seems to be this, viz.: that the honest exercise of official discretion in good faith, without fraud, for the advantage, or supposed advantage, of the association is not punishable; but if official action be taken, not in the honest exercise of discretion, in bad faith, for personal advantage, and with fraudulent intent, it is punishable. So understood, the *Britton Cases* afford no support to the position taken here, that whatever is done by a bank officer in his official capacity, however wrongful or fraudulent as against the bank, is mere maladministration, and not a crime. Such a position cannot be assented to.

It is next said, in behalf of the accused, that, although it may be a misapplication to deliver or take the moneys of the bank without making any loan, to make an irregular, unsafe, reckless loan is maladministration only; that in the charge to the jury the question of the character of the loans was submitted to the jury, instead of the question of the existence of the loans, and error thereby committed, because "the attention of the jury was directed to an irrelevant question and diverted from the true one." This argument assumes that

the charge was calculated to confine the attention of the jury to the question of good faith. If such had been the effect of the charge, it is not seen that error would have been committed. So far as the question of guilt or innocence under this statute is concerned, there is no distinction between a loan in bad faith for the purpose of defrauding the bank, and an application of money, with like intent, in a form other than that of a loan. A loan of the moneys of a bank by the president of the bank in bad faith, for the purpose of defrauding the bank, is no loan in the sense of the law. It is simply a fraud. If, then, as the argument under consideration assumes, the sole question submitted to the jury upon the counts for misapplication had been whether the transactions were or were not loans in good faith, such an instruction would have been the same in legal effect as submitting to them the question whether the accused had allowed his firm to take the money without making any loan. There may be such a thing as an unwise loan. But a loan made in bad faith, with the intent to defraud the bank, is not an unwise act, but a fraudulent act, and, strictly speaking, no loan at all.

In the charge the jury were carefully instructed that the accused was not to be convicted for making an irregular, unsafe, or reckless loan. Moreover, they were permitted to consider the precise question which, in the argument under consideration, is termed the true question of the case; for the jury were instructed "that the defendant had authority between the meetings of the board to make loans of the money of the bank, to make such loans to his firm without security, and to cause sums duly and honestly loaned to be placed to the credit of his firm." They were also instructed that "the mere form of a loan adopted as a cover and pretense to conceal a fraudulent transaction, would not entitle the firm to credits like these." They were also instructed that "the question was whether there was a *bona fide* agreement between the accused and Ward to loan these moneys, or whether the form of a loan was adopted by the accused to cover a different transaction." Elsewhere in the charge the question is stated to be whether the accused "was loaning money to a borrower on that day or not." Again, the language is: "If these were not loans in good faith, but the forms of loans only, used to cover a different transaction, the question arises at once, if they were not loans, what were they?" And the jury were then invited to consider whether these transactions were "part of a scheme devised or operated by the accused and Ward to get the money of this bank into their possession by fraud, by false pretenses, in order to defraud the bank." They were also invited to consider whether the accused, "believing that profits could be made by the bank, by the use of the bank's money in government contracts held by his firm, and induced by the hope of profit for the bank as well as himself, concluded to transfer moneys of the bank to the possession of his firm, to be invested in government contracts for the benefit of the bank as well as

of the firm, and in pursuance of such determination made the transfers and credits described in these counts under cover of the forms of loans, but really to enable the bank, without the knowledge of the board of directors, to share with Grant & Ward in the profits to be derived from the use of the bank's money in such contracts."

Under the charge the jury must have found that the transactions in question were fraudulent applications to the use of Grant & Ward, of the money of the bank, put into the form of loans in order to conceal a fraud. Such a finding compelled a conviction of the accused upon the first and fourth counts.

But if, as the counsel for the defendant contends, the transactions in question were loans, the conclusion drawn, that they did not constitute misapplications within the meaning of the statute because the president was authorized to make loans between the meetings of the directors, by no means follows. It is a mistake to suppose that there cannot be a criminal misapplication of the moneys of a national bank by means of a loan. The decisions of the supreme court in the *Britton Cases* countenance no such idea. If the transactions in question were loans, the question still would be whether they were such loans as amounted to a misapplication. Under the by-laws of the bank the president had a large discretionary power to make loans. But his authority in this respect was not unlimited. He had no right to make loans which he knew or believed would not be approved by the board of directors if the circumstances were known; much less had he any right to continue a series of transactions as loans wholly peculiar, exceptional, and dangerous in character, without communicating to the board of directors what knowledge he had respecting these transactions, and when he knew that such knowledge by the board of directors would have prevented a repetition of the loans. Such conduct on his part would be a clear abuse of the discretionary power, not the lawful exercise of it contemplated by the by-laws. A known abuse of discretionary power in making a series of loans which it is known the directors would not sanction, will constitute a criminal misapplication, if found to have been done in bad faith, for private gain, and not in the exercise of honest judgment.

The charge to the jury, therefore, if capable of being understood as supposed in the argument under consideration, would not be incorrect. And, if so understood by the jury, the conviction upon the first and fourth counts would be proper; for, so understanding the charge, the finding would be that the accused loaned the moneys of the bank to his firm, not in good faith, within the scope of his authority under the by-laws, and in the honest exercise of his judgment, but in bad faith, by an abuse of his authority, for the advantage of himself and the firm of which he was a member.

The charge, however, as the above extracts show, was not as restrictive as the counsel assumes, but permitted the jury to pass upon the question in the very form here contended for in behalf of the ac-

cused, and to say whether the transfers in question were loans or transactions of a different character. The charge upon the first and fourth counts, therefore, cannot be held to have directed the attention of the jury to an irrelevant question, and to have diverted the attention of the jury from the true one.

Next will be considered the point that the accused was improperly convicted upon the first and fourth counts, because the acts done by the accused amount to no more than making entries of false credits. Here it is sufficient to say that the accused did more than cause his firm to be credited with the sums. He caused the money represented by the credits to be paid to his firm, and the money was drawn out of the bank by his partner, in pursuance of an understanding had with the accused that the money should be so drawn; the same having been credited by the president for the sole purpose of enabling the money to be so drawn. The defendant's position requires him to maintain, not only that no fraudulent abuse of official power can be punished under the statute, but that no misapplication, which is effected in any part by means of such an abuse, can be a criminal misapplication. The counts are bad, it is said, because the false credit is stated to have been caused by the defendant as president. But the credit was only one of the means by which the misapplication was effected. The presentation of the checks of the defendant's firm under his authority, and chargeable to him as his act, and the payment of these checks by the bank by his authority, and pursuant to his instructions, also constituted part of the means charged. The argument, then, must be that because one of the means was an act done by the defendant as president, the result was not criminal. Such a position is untenable.

The next point is that the accused was improperly convicted upon the first and fourth counts, because there was no evidence that he personally took any money from the bank, or was personally present when any other person took away money; and it is contended that a personal taking of money of the bank is the act made punishable by the statute. The statute is not so understood. It says, "embezzles, abstracts, or wilfully misapplies." Each of these words must be given effect. The word "misapply" was intended to include acts not covered by the previous words "embezzle" or "abstract." To give to the word "misapply" the same meaning as the word "embezzle" is to eliminate a word from the statute. This cannot be done. Nor can the provision that the acts prohibited shall be deemed a misdemeanor, be disregarded. By this provision the law in ordinary cases of misdemeanor is made applicable, and by that law the officer who causes or procures the money of the bank to be misapplied is a principal offender, and may be charged as such. Aiders and abettors who are not officers of the bank are covered by the last clause of the section.

Next will be considered the point that the proof in support of the first count varies from the charge made in the count. The first count

of the indictment charges the accused with having misapplied $25,-000 of the money of the association. It then proceeds to set forth the means employed to accomplish the misapplication charged, and states, as part of the means, that the accused caused to be credited upon the books of the association, to the firm of Grant & Ward, the sum of $25,000. The proof was that the defendant credited in the pass-book of Grant & Ward three sums, viz., $25,000, $40,000, and $40,000. He also handed to the assistant cashier three stock notes,—one for $25,000, one for $40,000, and one for $40,000,—with instructions to enter up loans in conformity with them, and to credit Grant & Ward with the amounts. In pursuance of these instructions three loans—one for $25,000, and two of $40,000 each—were entered in the loan-book; but in entering the credit to Grant & Ward in the ledger the three sums were lumped, and the credit there appeared as for $105,000. The two sums of $40,000 were afterwards refunded; the $25,000 was not.

The jury were charged that the evidence showing that a larger sum than $25,000 was credited in the ledger, presented no legal objection to a conviction upon the first count. In this there was no error. The count in question contains no description of any writing, nor any description of any entry in any particular book. It simply avers that on a certain day the accused caused $25,000 to be credited to his firm upon the books. That averment was proved by evidence showing that he caused more than $25,000 to be then credited to his firm upon the books. A charge of embezzling $25,000 would be proved by showing the embezzlement of a larger sum, and it is not seen why a charge of causing to be credited the sum of $25,000 is not proved by showing a credit exceeding that amount.

Another point of variance is made in respect to all the counts for misapplication, viz.: That while the indictment alleges a credit upon the books of the bank to "a certain copartnership of which the said James D. Fish and Ferdinand Ward were then and there members," the proof showed that other persons besides James D. Fish and Ferdinand Ward were members of the co-partnership. The proof corresponded exactly with the allegation. The indictment simply said that Fish and Ward were members of the firm of Grant & Ward, and the proof showed the allegation to be true.

All the objections taken to the conviction upon the first and the fourth counts, worthy of attention, have now been considered; and, none of them having been found valid, the conviction upon these counts is sustained.

The defendant is also convicted of the misapplication charged in the twenty-second count. In this count the misapplication of $250,-000 is alleged to have been accomplished by causing this sum to have been paid upon checks drawn upon the bank by Grant & Ward in excess of the amount which the firm was entitled to draw and have paid by the bank. In regard to the conviction upon this count, it

is said that the evidence showed that these checks came through the clearing-house, and all that the accused did was to pay to the clearing-house a lawful debt due the clearing-house. Therefore, it is said, his act was not an act done to defraud the bank, but to fulfill an obligation of the bank to the clearing-house. But the checks, when presented to the bank, were recognized by the accused. By his direction they were not returned to the bank which had presented them at the clearing-house, as might have been done, and by his direction they were retained by the Marine Bank and charged to Grant & Ward in their account with the bank, constituting an overdraft to that amount. This overdraft on the bank by the defendant's firm the defendant permitted, as the jury have found, with the intent to defraud the bank of the money. The fact that the checks came to the bank by way of the clearing-house, and that they were charged against the account of Grant & Ward after the bank had settled its account with the clearing-house, does not change the character of the transaction, so far as the defendant is concerned. The checks were paid out of the moneys of the bank as the indictment charges. What the defendant did was to allow his firm to overdraw its account under circumstances warranting a finding of the jury that he did this act with intent to defraud the bank of the money. Such an act, done with such an intent, is misapplication of the moneys of the bank within the meaning of section 5209, and the conviction upon the twenty-second count was proper.

In the remaining courts the indictment charges the accused with having made eight false entries in the books of the association, each entry being particularly described in a separate count. Counts 11 and 12 charge the same act. In one count the intent charged is to deceive the bank examiner. In the other, the intent charged is to defraud the association. The same is true of counts 13 and 14. The jury convicted upon the counts 5, 11, 12, 13, 14, 15, 17, and 19. The conviction, therefore, is of six offenses of this character. In regard to those counts the court was requested to charge the jury that the defendant could not be convicted of making a false entry unless it was made by him individually. The court declined so to charge, and instructed the jury as follows: "It is not necessary, in order to convict the defendant of making false entries in the books of the bank, that it be shown that the entries were made by his own hand, or in his presence. It is sufficient if you are satisfied that the entries were in fact false in the particulars charged, and made by Daboll, the assistant cashier, as part of the regular and usual course of book-keeping pursued in the bank, in conformity with directions to that effect given Daboll by the accused for the purposes of fraud and deceit, he knowing that the collaterals named in the entry were not in the possession of the bank."

The finding of the jury, therefore, is that the entries set forth in the counts under consideration were made by the assistant cashier,

according to the usual course of book-keeping pursued in the bank, and that the defendant, for the purpose of fraud and deceit, gave directions which he knew would cause the assistant cashier to make, in the loan and collateral book of the bank, entries stating that the bank had loaned these several sums of money to the persons named, (Spencer, Armstrong, Doty, etc., the clerks and messengers of Grant & Ward,) and that the bank held as security for such loans the bonds and stocks named in the entry, when the bank held no collateral security for the moneys named, and had never made such loans, as the defendant knew. Such a finding compelled a conviction upon the counts now under consideration.

It is contended that according to the evidence all the defendant did was to authorize the loans referred to in these counts. The evidence was that the accused personally gave or sent to the assistant cashier, the pretended stock notes, knowing that the assistant cashier, upon so receiving the notes, would cause the entries to appear in the loan and collateral book, which would falsely state that the bank had the collaterals mentioned in the notes, and also knowing that the bank had not made loans to the persons named in the stock notes as borrowers of the moneys. It was no part of the duty of the assistant cashier to make loans. All he had to do was to make entries in the books of the bank. Under the evidence as to the course of book-keeping in the bank, the jury would have been justified in finding the entries in question to have been made by the accused, from the conceded fact that the accused delivered the stock-notes to the assistant cashier. But the defendant's own testimony went further, and compelled a finding that he caused the entries to be made, knowing that when made the entries would be false in the particular charged. It was not necessary to show that the particular form of statement employed by the assistant cashier in making the entry was directed by the prisoner. It is sufficient if he gave directions which he knew would result, and which did result, in an entry asserting that the bank had certain bonds as collateral security for certain loans, when the fact was otherwise. In *Van Campen's Case*, 2 Ben. 419, Mr. Justice BLATCH- FORD says: "In regard to the charge of making false entries it is objected that the person did not personally make the false entries, but that they were made by a clerk in the bank, by a direction of the prisoner." This is sufficient to make the prisoner a principal in the offense, and to constitute the making of the entries by him. In *U. S.* v. *Gooding*, 12 Wheat. 460, it is said: "Proof of the command or procurement may be direct or indirect, positive or circumstantial, but it is a matter for the jury, and not of legal competency."

Nor was it error to charge the jury that the entries might be found to be false, notwithstanding the testimony of the assistant cashier that the absence in the entries of the serial numbers of the bonds described would indicate to him that the bonds had never been delivered to the bank. The entry might have stated more than it did, but what it

might have contained is immaterial so long as what it did contain was a false statement that the bank had the collaterals specified, when it had none. It was in accordance with the defendant's request that the jury was charged that it was for them to say whether the entry, as made, was false in the respect charged.

Another point made is that the court erred in declining to charge that "loans to Grant & Ward would constitute a sufficient and valuable consideration for the promissory notes of third persons given to enable Grant & Ward to effect said loans. The notes would be the valid and binding obligation of the signers, and collateral to the loans." This request was properly refused. As the case stood, the question in regard to the liability of Spencer, Armstrong, Doty, etc., to the bank upon the stock notes was wholly immaterial.

In addition to the objections which have now been noticed, there were numerous exceptions taken to the admission and exclusion of evidence, in regard to which it seems sufficient to say that all have received careful attention; but none have been found which would justify the granting of a new trial.

The motion for a new trial is therefore denied.

WALLACE, J., concurred in the above opinion.

BROWN, J., also concurred in the above opinion, excepting what is said upon the question of variance presented by the evidence in support of the first count. Upon that point the opinion of Judge BROWN was as follows:

BROWN, J. No conviction should have been had, in my opinion, on the first count, because of a variance between the averment of the indictment and the proof. The first count alleges the misapplication of $25,000, in a particular way. It must, therefore, be proved as laid. The averment of this count is that the defendant "caused to be credited on the books of the bank, to the credit of Grant & Ward, the said sum of $25,000." The proof shows no credit to Grant & Ward of the sum of $25,000, but only the credit of the sum of $105,000 in a single entry, of which it is claimed that the $25,000 referred to in the first count formed a part. All the judges agree that if the averment of this count necessarily meant to describe a particular entry of the specific sum of $25,000, it would be a material variance from the proof. The majority are of opinion that the averment does not necessarily mean anything more than that the defendant caused the firm to be credited with $25,000, to which it was not entitled, without reference to any particular entry or number of entries by which that credit might have been made up.

This construction seems to me to disregard that part of the averment which states that the defendant caused to be credited "the said sum of $25,000." This $25,000 is here treated as a single sum, and

the averment is that *that sum* was credited; not that various sums making up the aggregate of $25,000 were credited, nor that a larger sum was credited, of which this $25,000 formed a part.   There could be no credit on the books except by some written entry; and an averment of such a credit of "the said sum of $25,000," means, as it seems to me, an *entry* of that particular *sum*.   Such an averment would not be satisfied by proof of 25,000 entries of the sum of one dollar each ; nor by proof of 105,000 entries of one dollar each, out of which the government might pick at random enough to make 25,000.    In this case the credit entry of $105,000 was founded upon three loans to third parties on their stock notes: two for $40,000 each, and one upon an unsigned note of $25,000.   The indictment doubtless intended to re-' fer to the last part of this transaction; but in the only entry "on the books of the bank" that exists to the credit of Grant & Ward there is nothing that indicates any division of the one sum of $105,000 credited to them.   There is no entry that corresponds with the averment of this count of the indictment.   Had the conviction been upon the first count only, I should, therefore, have thought the defendant entitled to a new trial.