### UNITED STATES v. YOUTSEY.

(Circuit Court, D. Kentucky. March 19, 1898.)

1. NATIONAL BANKS—CRIMINAL OFFENSES BY OFFICERS—EMBEZZLEMENT, ABSTRACTION, AND MISAPPLICATION OF FUNDS.

Evidence, introduced under an indictment against the cashier of a national bank for embezzlement, abstraction, and willful misapplication of notes of a bank, under section 5209, Rev. St., tended to show that the cashier had procured the making of four notes, for $15,000 each, by four different persons, who were insolvent; had discounted the notes, after attaching to them stock in land companies, belonging to the cashier, either worthless or worth only a small percentage of its par value and of the amount payable on the notes; had put the proceeds of the discounts to the credit of the insolvent makers of the notes on the books of the bank; had taken checks for the respective amounts from such makers; and, after depositing them to his own account, had used the proceeds to take up his own notes and those of another upon which he was indirectly liable, aggregating in amount $60,000. The indictment charged that these acts were embezzlement, abstraction, or willful abstraction with intent to injure or defraud the bank, and that the acts were done without the consent of the board of directors or the exchange committee thereof. It appeared that the loans to the cashier and to the other persons whose notes he thus withdrew from the bank were in excess of the 10 per centum of the capital stock of the bank, and that perhaps the chief purpose of the cashier was to reduce the loan within the legal requirement; and it was contended that, therefore, the intent to defraud or injure the bank, essential to conviction, was not present. *Held:* (1) Embezzlement is the unlawful conversion by an officer to his own use of funds intrusted to him, with intent to injure or defraud the bank; and that abstraction and misapplication are conversions of funds of the bank not especially intrusted to his care, with like intent. (2) That it was sufficient, in respect to the issue of knowledge and consent by the board of directors, for the government to show that neither the board of directors as a board, nor the exchange committee as a committee, nor a majority of individuals of either as individuals, knew of or consented to the discount of the new notes, or the substitution of the new notes for the old (if that was the real transaction), before the transaction was a completed one, and before the old notes were gone from the bank; that the necessity for the averment in the indictment was to meet the defense that one cannot steal what is given him, and cannot embezzle that which his principal consents that he may take. (3) That the crime here charged was not the discounting of bad paper or the acceptance of worthless securities; that the withdrawing of the old notes from the bank by means of such discounting and acceptance was not the crime charged, unless it was accompanied by an intent to defraud the bank; that, if the defendant knew that what he did would injure and defraud the bank, he was presumed to intend the natural consequences of his act; that such presumption would not necessarily be negatived by proof that he had another motive, and that his chief one, in making it appear to the comptroller that the excessive loans had been reduced, if in fact he knew that what he did would injure and defraud the bank; that the intent to defraud which must be shown is not necessarily an intent to wreck the bank; that it is only an intent on the part of the de-

fendant to injure the bank by the particular transaction, and may consist with a desire on his part generally that the bank shall prosper.

**2. SAME—FALSE ENTRIES—EVIDENCE—FRAUDULENT INTENT.**

It appeared in evidence that defendant summoned a bank clerk to his house, and directed him to make the books of the bank show a cash reserve of $50,000 more than it actually had, because of an expected demand for a statement from the comptroller. Defendant specified certain entries which he wished to have made, but left $12,000 unprovided for. The clerk added the $12,000 by a false entry, showing a deposit by a depositor of something more than that amount the day before. *Held:* (1) That a false entry made by a clerk under defendant's direction was made by the defendant, within the indictment, and that it was for the jury to say, as to the $12,000, whether the clerk's making it was within the direction of the defendant. (2) That proof that entries were false to the knowledge of the officer making or directing them, that they were in the usual course to be carried into the report to the comptroller, and were of a character calculated to deceive the comptroller or his agent as to the condition of the bank, raised a presumption that they were made by defendant with intent to deceive the comptroller or his agent, though such presumption was not conclusive.

This was a prosecution by the United States of Thomas B. Youtsey for violations of Rev. St. § 5209, as cashier of the First National Bank of Newport, Ky.

W. M. Smith, U. S. Atty.

Thomas McDougall, R. W. Nelson, E. D. Blinn, and Alfred C. Cassatt, for defendant.

TAFT, Circuit Judge (charging jury). We are nearing the end of a long trial. The strain upon all of us has been great, but the burden has fallen most upon you, who, accustomed to active life in the open air, must have grown weary with the long days of the hearing. I congratulate you that your tedious service is drawing to a close, and I thank you for the quiet patience and earnest attention which you have manifested.

By a law of the United States, any persons who comply with certain requirements therein set out can obtain a charter and establish a national bank. The primary purpose of the law was to provide the means by which the government might carry on large fiscal operations. To secure popular confidence in the banks thus invited into existence, the law subjects them to the supervision of the head of a government bureau at Washington, called the "Comptroller of the Currency," whose duty it is to keep a watch upon the conduct of every national bank in the country; to require reports from time to time of its operations and condition, sworn to by the officers, who may be presumed to know them; to send agents of his to make a personal examination of the books, accounts, cash, and securities of each bank; upon discovering violations of law in the management of the bank, to take steps to prevent their occurrence; and if such violations are flagrant, and the condition of the bank is insolvent, to appoint a receiver to wind up its affairs in accordance with law. The national banking act lays down certain rules for the conduct of banks, violations of which are not punished as crimes, but which it is the duty of the comptroller to enforce. You are all doubtless sufficiently familiar with the business of banking to know that it consists chiefly of receiving money on deposit,

subject to check, and of lending out at interest, not only the money paid in as capital by its stockholders, but also a large part of the amounts received from its depositors, retaining on hand enough to meet the checks which the depositors are likely to present in the ordinary course of business. The amount required to be retained on hand for this purpose by national banks is called a "reserve,"—a "lawful money reserve,"—and it may be held in cash, or it may be, in turn, deposited with some correspondent banks in certain large cities, called "reserve agents," where it is, of course, subject to be drawn out by draft at any time, and used as cash. In the case of banks in Newport, the law requires that the lawful money reserve of a bank shall be, at least, 15 per cent. of the deposits and its circulating notes or currency which it issues. Another rule laid down in the banking act is that the total indebtedness of any person or firm to a national bank shall not exceed one-tenth of the capital stock of the bank. The capital stock of the First National Bank of Newport was $200,000, so that no person could borrow more than $20,000 from that bank without a breach of this regulation.

As already stated, violations of these rules are not punished as crimes, but it is left to the comptroller to enforce them by an exercise of the supervisory power intrusted to him by law. The national banking act statute does, however, denounce as crimes certain acts of banking officers, in order to secure fidelity and honesty on their part in the performance of the duties and the discharge of the trusts assumed by them, and in order to obtain from them a truthful statement of the condition of the bank in their charge. Section 5209 of the Revised Statutes of the United States provides that every president, director, cashier, teller, clerk, or agent of a national bank who embezzles, abstracts, or willfully misapplies any of the money, funds, or credits of the association, or who makes any false entry in any book, report, or statement of the association with intent to defraud the bank or any other person, or with intent to deceive any officer of the bank or any agent appointed to examine the affairs of the bank, shall be deemed guilty of a crime, and be punished by imprisonment in the penitentiary. The indictment of the defendant which you are to try charges him with violating this section. The grand jury, in charging an offense, is entitled to describe it in as many ways as it sees fit, in different counts, in order to make sure that the proof produced on the trial will correspond with the description of the offense in some one of them. But one punishment, however, is imposed for the same offense, however many the forms in which it is described. The grand jury is also entitled to embrace in one indictment charges of different and distinct offenses committed by the defendant, of a similar nature.

Coming now to the indictment in this case: It embraces 27 counts. Of these, the twenty-sixth and twenty-seventh are out of the case, and you may acquit the defendant on them. Of the others, the first six counts relate to one transaction, of date December 12, 1894. The charge in all six counts is substantially that the defendant, being cashier, converted notes of A. S. Berry, belonging to the bank, and aggregating some $15,000 in amount, to his own use, and to the use of Berry, without the knowledge or consent of

the directors or the exchange committee, and with the intent to injure and defraud the bank. In the first count the act is charged to have been an embezzlement by the defendant of the notes in his custody as cashier; in the second count it is charged as a willful abstraction of the notes; and in the third count, as a willful misapplication of the notes. Embezzlement is the unlawful conversion by an officer of the bank to his own use of funds intrusted to him, with intent to injure or defraud the bank. Abstraction and misapplication are a conversion to his own use by an officer of the bank of funds of the bank which are not especially intrusted to his care. The next three counts, Nos. 4, 5, and 6,—one for embezzlement, one for abstraction, and one for misapplication,—differ from the first three in that they set forth the method in detail by which the conversion of the notes is charged to have been effected. They aver that defendant procured one J. L. Bryan to execute a note to the bank of $15,732, and gave him credit for the same in an account on the books of the bank; that he then caused said credit to be transferred to defendant's own account, by a charge of the same against Bryan, and a credit to himself; and that he then drew a check on his own account, payable to the bank, for the same sum, and in this way purported to pay the Berry notes, and withdrew them from the bank; that he knew Bryan to be insolvent, and the collateral attached to the Bryan notes, being $25,000 par value of Ft. Thomas Land Company's stock, to be worthless; and that defendant did all this with intent to injure and defraud the bank. The next six counts, from the seventh to the twelfth, inclusive, relate to a transaction of December 11, 1894,—the day before. The charge in each of them is substantially that defendant, being cashier of this bank, converted notes of A. S. Berry and the Newport Ferry Company,—two notes of the Newport Ferry Company, and five notes of A. S. Berry,—belonging to the bank, amounting to about $30,000, to his own use, and to the use of Berry and the ferry company, without the knowledge or consent of the directors or of the exchange committee, and with intent to injure and defraud the bank. In the seventh count the act is charged as an embezzlement; in the eighth, as willful abstraction; in the ninth, as willful misapplication. The next three counts vary as the previous three, but they are more elaborate, in that they set out in detail the method by which the alleged crime was committed. They aver that the defendant procured one E. W. Nickerson and H. C. Drake each to execute a note for about $15,000; that he then gave them credit on the books of the bank for the amount of these notes, respectively; that he then caused these credits to be transferred to his own account, by charges against Nickerson and Drake, and that he then drew a check against this credit in favor of the bank, and in this way purported to pay the second series of Berry notes, for $30,000; that when he did this he knew that Berry was solvent, and his notes were good, and that Nickerson and Drake were insolvent, and that the collateral attached to the notes signed by them, which aggregated $30,000 par value of Jacobs Additional Land Company's stock, was worth but 25 per cent. of its par value;

and that defendant did all this with intent to injure or defraud the bank. The next six counts, from the thirteenth to the eighteenth counts, inclusive, relate to a transaction of December 14, 1894. The charge in each of them, substantially, is that defendant, being cashier of the bank, converted notes made by himself, and belonging to the bank, amounting to something less than $15,000, to his own use, without the knowledge of the bank directors and exchange committee. In the thirteenth count the act is charged as an embezzlement of the note then being in the custody of the defendant as cashier; in the fourteenth count it is charged as an abstraction; and in the fifteenth count, as a misapplication of the note. The next three counts vary as the previous three counts; but they are more elaborate, in that they set out in detail the method by which the embezzlement, abstraction, or misapplication was committed. They aver that the defendant procured one C. G. Mason to execute a note to the bank for about $15,000; that he then caused the amount of the note to be credited to Mason, and caused the credit to be transferred to defendant's individual account; that he then checked the same out of the bank, and purported to pay the defendant's note; that he did this knowing that his own note was good, and that Mason was insolvent, and that $25,000 par value of Ft. Thomas Land Company's stock, attached as collateral to the Mason note, was worthless; and that all this was done by defendant without the knowledge or consent of the bank directors or exchange committee, and with the intent to injure or defraud the bank. This series of transactions makes about one-half of the case; and I shall now state the propositions of law which should govern you in applying the evidence to these charges, and in determining whether the guilt of the defendant has been established.

In the first place, the law presumes that persons charged with crime are innocent until they are proven by competent evidence to be guilty. To the benefit of this presumption of innocence the defendant is entitled; and this presumption stands as his sufficient protection, unless it has been removed by evidence proving his guilt beyond a reasonable doubt. The burden is on the government, before the defendant can be convicted, of establishing every essential element of the crime charged, beyond a reasonable doubt. A reasonable doubt of guilt is a doubt growing reasonably out of the evidence, or the lack of it. It is not a captious doubt; not a doubt engendered merely by sympathy for the unfortunate position of the defendant, or a dislike to accept the responsibility of convicting a fellow man. If, having weighed the evidence on both sides, you reach the conclusion that the defendant is guilty to that decree of certainty that would lead you to act on the faith of it in the most important and critical affairs of your life, you may properly convict him. Proof beyond a reasonable doubt is not proof to a mathematical demonstration. It is not proof beyond the possibility of mistake. If such were the standard of evidence required, most criminals would go unwhipped of justice.

Having defined the degree of proof required to establish every necessary element of the crime charged, I come now to point out to

you what are the essential elements of the three crimes charged in the first 18 counts, which must be established beyond a reasonable doubt if you should return the defendant guilty on any one of them. First, it must appear that this was a national bank, and that the defendant was its cashier; second, it must appear that the defendant converted the notes of Berry and himself to his own use and that of Berry; third, it must appear that he did this without the consent or knowledge of the board of directors or its exchange committee; fourth, it must appear that he intended by such conversion to injure or defraud the bank. In the embezzlement counts it must also appear that the notes charged to have been embezzled were intrusted by the bank to him as cashier. It is not disputed that this was a national bank, or that the defendant was its cashier at the dates of the transactions under inquiry. It is not disputed that the Berry notes, the ferry company notes, and the Youtsey notes passed from the possession of the bank to Berry and Youtsey, respectively, and inured to the benefit of Berry and Youtsey; nor is it disputed that at the same time the Bryan, Nickerson, Drake, and Mason notes came into the bank, and that the books of the bank show that the proceeds of the Bryan, Nickerson, Drake, and Mason notes were used by Youtsey to pay the Berry, ferry company, and Youtsey notes, and that the transactions were all carried through by the defendant. The question at issue between the government and the defendant is whether this was a genuine transaction,—a real discount of the Bryan and the other notes for cash, and the use of the cash to pay the Berry and Youtsey notes; or whether this was a mere palpable substitution of worthless paper for good paper, bearing the semblance of discount, but in reality being a mere cloak for slipping good paper of Berry and defendant out of the bank, and leaving in its place notes of little or no value. I shall allude to this issue more at length in the discussion of the evidence; but I pass on now to consider the ultimate facts which the government must establish, and on which the issue just stated has an important bearing.

The first point in issue is whether the government has established beyond reasonable doubt that what Youtsey did with respect to the Berry and Youtsey notes, and the Bryan, Nickerson, Drake, and Mason notes, was not known to the board of directors or to the exchange committee, and consented to by them at or before the time when it was done, on December 12, 13, and 14, 1894. If the board or the exchange committee authorized him to discount the four notes which appear to have been discounted, it would not have been a crime on his part to have persuaded the makers of the notes to allow him to use the proceeds to pay his own indebtedness. In that case, if the bank was injured, it would have been with its own consent, expressed through its governing board. If the board or the exchange committee consented to the substitution of the new notes for the old notes, certainly the defendant could not be held under this indictment. On the other hand, it is sufficient with respect to this issue if the government has shown to your satisfaction, beyond a reasonable doubt, that neither the board of directors

as a board, nor the exchange committee as a committee, nor a majority of either as individuals, knew of or consented to the discount of the new notes, or the substitution of the new notes for the old (if that was the real transaction), before the transaction was a completed one, and before the Berry and Youtsey notes were gone from the bank. Evidence as to the knowledge of the directors of the Bryan and the other notes after the Berry and Youtsey notes were gone was only permitted as reflecting upon the question whether the directors knew how the notes came into the bank when they did come in. The fact in issue is, did they know of the first reception of these notes at the time they were received? Did they consent to their reception and discount at the time the Berry and Youtsey notes were taken out? If they did, the defendant must go acquit on these charges. If they did not, it is no defense that they may have afterwards learned of the transaction, or of the presence of the notes in the bank. The principle on which rests the requirement that the government shall show that there was no consent by the board of directors to the defendant's acts before conviction is that one cannot steal what is given him, and cannot embezzle that which his principal consents that he may take. The question here really is, did the bank consent, by its governing board or its exchange committee, to the acts of Youtsey, which are charged to be criminal, before they were done, or at the time? If so, then he cannot be held on these charges.

As to the second point in issue, which is the intent to defraud or injure the bank, necessary to establish the crime: It is not a crime for a cashier to discount bad paper, or accept for collateral worthless securities, unless the act is accompanied by an intent to defraud the bank. That must appear affirmatively. By way of inducement to show the intent, the indictment avers that Bryan was insolvent, and that the collateral was worthless, and that the defendant knew these facts. If you find that Bryan and the others were insolvent, and that the collateral to each of the notes was worthless, or worth much less than the face value of the note,— if you find that the defendant knew that the Berry and ferry company and Youtsey notes were good, that Bryan and the others were insolvent, and that the collateral was worth much less than the notes it purported to secure, and that he did not believe either that Bryan and the others would pay the notes they had signed, or that the collateral was of value sufficient to pay the notes,—the presumption is that the defendant intended the natural consequences of his own act, and therefore intended to injure or defraud the bank, though this presumption is not conclusive; and it is for you to determine from the circumstances whether this presumption is maintained or rebutted; and, if you do not beyond a reasonable doubt think that the presumption is the right one, then it is your duty to acquit. And, if this be true,—what I have already stated with reference to the belief of the defendant and his knowledge,— the presumption of intent to defraud or injure the bank would not necessarily be negatived because there may also have been present another motive, and that the chief one, if they were substitutions,

to wit, the purpose to make it appear to the comptroller that Berry and the defendant had paid their notes, if in fact the defendant knew that what he did would injure the bank.   Of course, if he did not believe that he was going to injure or defraud the bank by these transactions, and had only the single purpose to comply with the comptroller's directions by transferring the debt from himself and Berry to others, without prejudice to the bank, then you could not find the intent to defraud, even if the sequel was in fact disastrous to the bank.   But his desire to avoid the further criticism of the comptroller by making the debt appear in the names of others would not necessarily exclude the intent to defraud if you find that he really believed that what he was doing was taking from the bank something of value, and replacing it with something comparatively worthless.   The intent to defraud is not necessarily an intent to wreck the bank.   It may be only an intent for his own purposes to injure the bank by the particular transaction, and may consist with a desire generally that the bank in other respects shall prosper.

Evidence has been introduced to show that the defendant has been afflicted for some years last past with occasional attacks of epilepsy, and it has been stated by witnesses, medical and otherwise, that such attacks render the patient entirely unconscious for a short time, and take from him the normal use of his mental faculties, especially his memory, for a greater or less period immediately following each attack, even after consciousness has apparently returned, and that during this period he could hardly be said to distinguish between right and wrong.   There was also evidence to show that such attacks have a tendency to impair the subject's mental faculties permanently, and especially his memory and his judgment.   Now, one who cannot distinguish between right and wrong by reason of a diseased mind cannot be convicted of crime for an act done by him when in that mental state.   The presumption is that all men are sane; but if, in the face of that presumption, the evidence is sufficient to raise a reasonable doubt in your mind that, at the time any act was committed by the defendant which is made the subject of the charge here, he was not able to distinguish between right and wrong, it is your duty to acquit him of that charge.   You may also consider the mental condition of the defendant, though short of insanity, as a circumstance in reaching a conclusion whether he had the intent or knowledge essential to be proven in the conviction of any or all of the charges in this indictment.   In considering the mental condition of the defendant at any time, you are not confined to the medical evidence or to direct evidence of his mental condition; but you should also consider the surrounding circumstances, the work actually done by the defendant, the mental strength necessarily required, if any, to do the work he did, and the probability or improbability that one engaged in the discharge of the duties of his office and the carrying on of his several enterprises could be mentally unsound to any appreciable extent, either in memory, in judgment, or in ability to distinguish between right and wrong, and still be permitted by his friends to continue in charge of the bank and other business transactions of importance. The mental condition of the defendant which is important here is

that in December, 1894, and in the year following. His later condition, except as reflecting on the evidential weight to be given to his conversations with Hayes and Wilshire, is not especially material. It may indicate the progress of the disease, and throw a backward light on its history; but the real question is, what was the mental condition of the defendant in 1894 and 1895, two or three years before the failure of the bank, and one or two years after the violent fits of epilepsy first began to seize him? I shall allude to this subject again when I discuss the false entry charges.

And now, gentlemen of the jury, I have concluded my charge upon the law in respect to the first 18 counts, and I come to a hasty review of the facts. You are the sole judges of the facts. The responsibility is wholly with you. In the federal courts, however, it is within the proper sphere of the judge to assist the jury, so far as he is able, in analyzing the facts and stating the issues which arise thereon, provided he makes it clear, as I wish to make it clear to you, that you are the sole judges of the facts, and are entirely warranted in rejecting my recollection of the testimony, and in declining to accept any suggestion I may make in regard to it.

Upon the issue of the knowledge of the directors of the discount of the four notes of Bryan and the others, the government has introduced every director who was a director in December, 1894, and each director has said with more or less positiveness that he never heard of these notes until some time after they were in the bank. Mr. Robson said he heard of one of the notes some time in December. Whether that was before or after may not be clear; I mean, before or after they came into the bank. Spinks and McCracken, the exchange committee for that month, are quite sure that they never approved them as a committee. For the defendant it is pointed out that the notes were regularly entered on the discount register and the other books, and that it was open to the directors, and especially to the exchange committee and to the president, Dr. Gunkel. I may say, in passing, that the fact that these notes were all set out on the books of the bank, and also their renewals, is put before you as a significant circumstance that the defendant had nothing to conceal with respect to them. Whether this grew out of a feeling of security that the defendant had with reference to his control of the directors, or grew out of a feeling of innocence on his part that he had not done anything wrong, is a matter for your consideration. The defendant further, with respect to the knowledge of the directors, points out that this was at a critical time in the history of the bank, when especial attention had been called by the comptroller to the Berry and Youtsey notes, and that their payment or removal from the bank was very likely to direct attention to the mode in which they were withdrawn; that the four new notes were for $60,000 in the aggregate, and were quite likely to invite the attention of any one giving the slightest perusal to the discount register. For the government it is responded that the board of directors was not made up of bright business men, but of men with little or no banking experience, and of not startlingly keen perceptions, and that they all looked to and leaned on Youtsey in spite of the warning they had received from Washington. The only direct evidence that any one

of the directors knew of the discount of any of the notes at the time is Drake's statement that he told Gunkel of Youtsey's proposal to him in respect to the note to be given. Gunkel remembers the conversation, but says that Drake merely asked him whether Youtsey was good financially. Both agree that Youtsey had referred Drake to Gunkel; and this is entitled to weight in considering whether Youtsey was attempting to conceal what he was doing from Gunkel. It is the duty of the jury and the court to reconcile conflicting statements when they can; and one relevant query in this case, therefore, would seem to be whether Drake may not have said one thing, and Gunkel understood another. You have seen them both on the stand, however, and you can judge. Even if Gunkel knew of the Drake note, however, this would not be the knowledge or consent of the board or the exchange committee, unless notice of the fact was communicated by Gunkel to his directors or fellow members. It was brought out in cross-examination of some of the directors and of the employés of the bank that the cashier did discounting at hours when the exchange committee was not in session; and there is also some evidence that the discount register was not always taken by the exchange committee. Some of the evidence seems to show that they took the discount register, and examined it more closely, towards the latter part of the bank's existence. The question which you have to answer is whether Youtsey had an opportunity to take in the notes without consulting any of the directors, and, having the opportunity, whether he improved it. Was his position in the bank such that he would feel able to carry out a plan like the one under discussion, without fear that after the thing had been done, and his directors gradually became aware of it, he could be reasonably sure that they would not attempt to undo it? You must, in considering this question, give weight to all the surrounding circumstances, and credit statements where you can, rejecting only that which is inherently improbable.

And now as to the intent: This is naturally arrived at by studying the transactions closely. Were these discounts real, genuine transactions, by which the makers of the notes got the cash, and then turned it over to Youtsey, or were they merely part of a scheme to give the appearance of business transactions as a cloak to a mere substitution of new paper for old, the new papers to be signed by those whose insolvency rendered them free from embarrassment in assuming a large obligation? You have heard the evidence of Bryan, Nickerson, Drake, and Mason, and will make up your mind as to Youtsey's purpose in the matter of his conversation with them and from other circumstances. If the collateral which he put up on each note he believed honestly was ample security for each note, when it or its renewals should become due, it would be strong ground for concluding that his motive here was not to injure or defraud the bank, but only to help it out by relieving it from the disciplinary measures which the comptroller might take with it were the Berry and Youtsey notes to continue in the bank.

As to the value of this security you have heard much evidence. The actual sale of the stock, of which Youtsey was aware, was from 50 to 60 cents on the dollar for the Jacobs addition, and from 25 to

33 cents on the dollar for Ft. Thomas. The stocks had no market value, the evidence seems to show; but the witnesses give their judgment from their knowledge of the property that the Jacobs addition was worth par, and the Ft. Thomas Land Company stock from 50 cents to par. If the Jacobs addition stock was worth 50 cents only, the collateral would not pay—I mean the collaterals on those notes secured by it—more than half the notes it secured. If the Ft. Thomas was worth but 25 cents,—for which Youtsey and two others sold some of it, in November, 1894,—it would not pay one-half of the notes it secured. But the question is not what we think about the stocks when they seem to be unsalable, but what were they worth in 1894, and what did Youtsey really believe they were worth? The panic occurred in the spring of 1893, some 18 months before the transaction. It is said to have had little effect on land at first. How that is you must judge. In considering what Youtsey really believed as to this stock, as collateral, you may consider that he was discounting notes for four months as a banker. If he was discounting them as a banker, and if he did discount them, you may properly ask yourselves whether he thought this was good collateral to realize on in that short time, when it had no market value. However, it is all a question of his honest belief; and if, by renewals, he really believed that it would pay the debt, you must give him the benefit of that fact in determining his intent in the matter, and, finding it in the affirmative, acquit him,—that is, if you do find it in the affirmative. You may also give such weight as you think it ought to have, as bearing on his honest belief and purpose in this matter, to the evidence concerning his epilepsy, and its influence on his judgment, in 1894. Nickerson, Bryan, and Drake were all insolvent, so they testify. Nickerson says he told Youtsey that he was, and as Bryan and Drake were mere clerks, and hardly more than 21 years of age, it would hardly seem reasonable that Youtsey regarded them in any other light. Mason's statement you must weigh as best you can. If you believe him not to be mistaken, he was solvent. His account of the stock transaction is hardly consistent with Youtsey's report of his obligation to pay the Mason note, made to Wilshire, according to Wilshire's statement; but he was introduced by the government, and the party introducing a witness is usually supposed to vouch for his veracity. However, you must judge of him as you saw him and heard him.

With this very hasty review of the evidence, leaving out many of the circumstances which you must properly consider on the Berry and Youtsey note transaction, I leave them to you, after reminding you again that you are the sole judges of the facts, and that no statement of mine, either as to what the evidence is or what its effect is, ought to control you, if it does not accord with your recollection or your judgment.

And now, gentlemen, having finished the discussion of the law and evidence under the first 18 counts, and the Berry and Youtsey notes transactions, we come to the counts which charge the defendant with making, or causing to be made, false entries upon a blotter of the bank and the report to the comptroller of the currency, with the in-

tent to deceive the directors of the bank or the agent of the comp-troller. The nineteenth, twentieth, twenty-first, and twenty-second counts are based on the four entries made in the blotter, in accordance with the slip handed to Winter by Phillips, by which it is said that the account of the First National Bank of Cincinnati was made to show a balance of $25,000 to the credit of the Newport Bank, when the account, if truly stated, would have shown a balance of $25,000 to the credit of the Third National Bank. The entries are four. The first is an entry showing an addition to the deposits of $12,500; the second, an entry charging the Third National Bank with $12,500; the third, an entry showing a reduction in bills discount, held by the New-port Bank, by sale, payment, or renewal; and the fourth, a charge against the Third National of $38,775.56. The twenty-third, twenty-fourth, and twenty-fifth counts charge that false entries were made, or caused to be made, in the report to the comptroller by the defendant, with intent to deceive the directors of the bank and any agent of the comptroller, by which the amount due from the reserve agents was increased from $3,206.87, as it should have been, to $30,029.95; the amount of legal tender notes was increased from $27,642, as it really was, to $47,642 (the indictment says from $17,642, but I assume that that was a mistake; at any rate, it is immaterial); and the amount due to reserve agents was decreased from $24,968.25, the proper and true amount, to $516,27,—that is the amount due from the Newport Bank to the First National Bank of New York. The defendant can-not be convicted under these seven counts unless it is first shown that he made them, or caused them to be made. If the defendant directed Phillips to increase the reserve $50,000, by making entries on the books of the bank which would falsely show that the Third National Bank owed defendant's bank $25,000, instead of the defendant's bank owing the Third National Bank $25,000, as the fact was, and Phillips made entries effecting such result, the defendant is responsible for the making of those entries, under this indictment, exactly as if he had made them with his own hand. If the defendant wrote out the report to the comptroller, and directed Winters to copy same, and the copy was sworn to, and became the report, the defendant is as respon-sible under the indictment for the false entries made therein as if he had made them with his own pen. The defendant cannot be con-victed under these counts, unless it appears beyond reasonable doubt that, by such false entries, he intended to deceive either the directors of his bank or the agent of the comptroller. If, however, he knew the entries were false, he must be presumed to have intended the natural consequences of his act; and therefore, if the report was calculated to deceive those reading it, he must be presumed to have intended to deceive those to whom the report would come. The presumption is not conclusive, but it is the natural one.

And now I come to the evidence as to the false entries. If you do not believe that Phillips went to Youtsey's house on the evening of December 7th, Saturday, and had the conversation he reports, then you must acquit the defendant on the nineteenth, twentieth, twenty-first, and twenty-second counts, for his guilt rests solely on that conversa-tion. Now, did it occur? Phillips says it did. He is a confessed

accomplice of Youtsey in the alleged crime, if it was committed by both; and it is the duty of courts and juries to accept the statements of accomplices with caution; but, if it did not occur, the questions which arise are two: Why did he make the false entries as to which there seems to be no doubt? And, second, why does he take the stand, and expose himself to the necessary obloquy which his confession involves? The answers suggested to these queries are that he has a present motive to testify falsely against Youtsey to save himself from prosecution, and that he had motive enough to save the bank from the comptroller by making false entries because he owned 40 shares of its stock. The weight of these suggestions you must consider. Phillips is corroborated by Winter's statement that he asked Youtsey twice whether the $38,000 charged to the Third National Bank was all right, —during the week after December 8th,—and that Youtsey answered that it was, or that he knew about it; and by Hayes' account of Youtsey's assumption of all responsibility for these false entries in April or May, 1897. Opposed to this is the statement of Miss Hopkins, the defendant's sister-in-law, and T. O. Youtsey, his son, that defendant had had an epileptic fit on Friday, December 6, 1895, and was at home all that day and all day Saturday, and that Phillips did not come to the house and talk with defendant, as he says he did. You may estimate the weight of this evidence in the light of the difficulty that one would naturally have in being entirely clear as to what happened two years ago on a particular Saturday,—what happened two years ago on a particular Saturday in respect to a matter which was then of less interest than now; and, on the other hand, may consider the circumstances then existing which might serve to have fixed the events of the day more clearly than usual in the mind of the witnesses, such as the fit of the day before, and other things. It is your duty to reconcile, as far as you can, conflicting statements of witnesses; and the question for you here is whether it is more reasonable to suppose that these two witnesses are mistaken in their statements than that Phillips has committed willful perjury, because he can hardly be mistaken. However, if the evidence of Miss Hopkins and young Youtsey raises a reasonable doubt in your minds as to Phillips' visit, you must give the defendant the benefit of it, and acquit him on these four charges in relation to false entries in the blotter. If, however, you believe that Phillips did go to see the defendant, you must consider whether he was in a condition of mind to know what he was doing, and to distinguish right from wrong. He had had an epileptic fit 36 hours before. Did that, in 1895, unfit him to transact business? You know the evidence. It appears that he not infrequently went to the bank the same day that he had the fit, and remained some time. It is said that he was not himself on such occasions. If, however, on Saturday night, he had the mind to conceive the plan to call Phillips to him, and direct the course which Phillips took, it would be a circumstance tending to show that the confusion consequent upon such a fit had left him. If, however, you have a reasonable doubt of his sanity, and his ability to distinguish between right and wrong at that time, you ought to acquit him on counts 19, 20, 21, and 22. But, if you find that he did have the talk with Phillips which Phillips says he had, then you must con-

sider what it meant, and how far it involved the defendant in the crimes charged against him in counts from Nos. 19 to 22, inclusive.

In the outset, I called your attention to the requirement of the national banking act, that this bank must always have on hand cash equal in amount to 15 per cent. of the money which its depositors had left with it, and 15 per cent. of the bank notes or currency which, under the law, it was permitted to issue. This, as you will see, is a very necessary rule, because otherwise, if a bank lent out on interest all the money deposited by its depositors as soon as it came in, it might very well happen that some depositors might wish to draw out on checks more than others had put in, and there would be no money to pay them. Hence the importance of maintaining a lawful money reserve. When, however, the bank has loaned more money than it should loan to certain individuals, who either will not or cannot pay up, there is sometimes great difficulty in keeping cash enough on hand to meet this regulation of law. The letters of the comptroller read in evidence here show that this was one of the great difficulties under which this bank was laboring, and that it was largely due to the slowness with which many of those who borrowed money of it paid their notes. Let us assume that the lawful money reserve of a bank is $75,000, and it has loaned out on notes $50,000. Now, suppose it has on hand cash amounting only to $50,000, instead of the required $75,000. Now, the natural way to make that lawful reserve good is for the bank to collect $25,000 of its loans, and make its cash up to $75,000. But perhaps its notes are not due to that extent. Well, it can sell notes outright to some other bank for $25,000; and, by putting on the back of the notes the words "Without recourse," it can rid itself of any liability on those notes, and in this way can get the money without assuming any obligation; or it can rediscount notes to the extent of $25,000 with some other bank,—that is, it can indorse the notes, and transfer them to the other bank, agreeing by its indorsement to pay the notes thus transferred if the makers of the notes do not. The rediscount is, in a sense, a loan. I have already said to you that the lawful money reserve need not all be kept in the vaults of the bank. It can be deposited with another bank, called its "reserve agent"; that is, its agent for holding part of its reserve. Now, then, if the notes which are sold or rediscounted are sold or rediscounted to the reserve agent bank, that bank need not send the cash to our bank's vaults; it can just enter up a credit of that amount on its books, to be drawn against by our bank on checks or drafts; and it is just as much a part of the lawful money reserve as if it were in our vaults. Thus, you see, the account between a bank and its reserve agent plays a very important part in the question of lawful money reserve. If, by entries in this account, the bank shows that it has sold notes to its reserve agent, and has obtained a credit in this account to the amount of the notes, when in fact it has not done so, it has made a false entry, which indicates that it has more in its lawful money reserve by the amount of the notes than it really has.

With this explanation, let us construe the meaning of Phillips' evidence. He says that the defendant told him, by entries on the books of the Newport Bank, to change the account between it and the Third

National Bank in such a way that the account would show that the Third National Bank owed the Newport Bank $25,000, instead of the Newport Bank's owing the Third National Bank $25,000, as it really did. In this way, you observe, the lawful money reserve of the Newport Bank would be increased $25,000 apparently, while the account would be made false by $50,000. Now, what did Phillips do? He made one entry, he says, which purported to show that Spinks had deposited a check for $12,500 in the Newport Bank, when in fact he had not; that is, the deposit account of checks deposited was increased. This was false. He made another to show that the Newport Bank had sent this check to the Third National Bank, and had received a credit of $12,500 for it. In this way he represented by these two entries that the bank had more assets of money and notes together than it really had. In addition to this, he made an entry showing that the Newport Bank had turned into cash, by sale or collection, $38,775 of its notes, and another entry showing that this amount had been deposited to the credit of the Newport Bank with the Third National Bank. As a matter of fact, it had not turned into cash, by sale or collection, any of its notes; so Phillips testifies, and so the books show. In this way he gave the Newport Bank a credit of $50,000 with the Third National Bank which it did not have, and brought up its apparent money reserve, as shown by its books, by, at least, $25,000. Phillips says this was done with a view to the report to the comptroller, as suggested by Youtsey, which it was expected the bank would have to make in a short time thereafter, of the condition of the bank, and which it did have to make in fact, as of the condition of business, on December 13th, about a week later. In this report, the entries directed by Phillips necessarily had the effect of increasing the lawful money reserve by, at least, $25,000. I mean the effect of the entries in the blotter, carried into the other books of the bank, increased the lawful reserve on the report to the comptroller as of the 13th of December.

Now, it is pointed out on behalf of the defendant that, even if it be true that Phillips had the talk he says he had with defendant on the evening of December 7th, the defendant did not tell him to introduce a: false entry as to a deposit of a check by Spinks to the amount of $12,500, and, therefore, that he cannot be held responsible for that entry, and its counter charge of the same amount to the Third National Bank. Whether this is true is for you to determine,—whether what he did was within the directions which he says were given to him. Phillips says defendant told him to make entries changing the balance in favor of the Third National Bank, and against the Newport Bank, so that it should be a credit of $25,000, instead of a debit of $25,000. That involved false entries to the extent of $50,000, and the Spinks entries were used by Phillips to make up $12,500 of the change of $50,000. If this went beyond the suggestion of the defendant, and was not within his general directions, he cannot be made responsible for Phillips' acts in respect to the Spinks entries; and you must say how that is.

It is further claimed on behalf of the defendant that the condition of the account between the two banks was such that the defendant

might very well have had no intent to deceive in suggesting a change of $50,000 from one side to the other of the account. On November 22 and November 23, 1895, the Newport Bank, through Youtsey, deposited, as general collateral to secure overdrafts, $50,000 in round numbers in notes indorsed by it; and these were still in the Third National Bank when Youtsey is said to have directed the entries. Youtsey had authority from the board of directors to rediscount paper at the Third National Bank, and the claim made in his behalf is that he intended to rediscount this collateral in the Third National Bank, or sell it to the Third National Bank, and in that way at once make good the false entry of $50,000 which he is said by Phillips to have directed. If this had been done when he returned to the bank, or shortly after, it would certainly have a very strong tendency to show that, though the entry was false, it was not meant to deceive anybody. You will observe that the contention assumes that he might have rediscounted the notes he had with the Third National Bank by merely asking for it. The sequel would hardly seem to support this assumption, because in January, 1896, following the December, 1895, when this took place, the Third National Bank, in rediscounting $40,000 of the bills discount of the Newport Bank, required the directors of the Newport Bank to sign a bond for $50,000 as security. Again, if Youtsey had intended such a disposition of the entries, you may inquire of yourselves why the entry of $38,775.56 of a false charge to the Third National Bank remained in the books and accounts of the Newport Bank until March 14, 1896, some three months later, as Winter points out in the book. Winter says that the defendant was figuring from the books every day how the Newport Bank was standing with the other banks. Had a rediscount of the collateral notes with the Third National Bank been intended, the notes would have had to appear in the rediscount column of the report to the comptroller as a liability of the Newport Bank; whereas the entry as made and as allowed to remain on the books of the bank was that of a payment of the notes, or a sale of them, without any liability remaining on the part of the Newport Bank in respect of the notes thus sold. If the defendant did not intend the entry to be false, you may properly consider why he did not rectify it as soon as he returned to the bank if he had his attention called to it by Winter, as Winter states; or why, if he intended a rediscount of paper, he did not go to the Third National Bank, and make the entry true, which, as it stands, has nothing to justify it. But it is said that the false entry was most foolish, because so easily discovered by the comptroller or his agent. The length of time the entry remained on the books without detection by the comptroller would seem to indicate that it was not so easy of discovery as has been suggested. Still, if the presence of $50,000 of collateral in the hands of the Third National Bank from the Newport Bank at the time this entry was made raises a reasonable doubt in your mind as to the intent of Youtsey to deceive the comptroller in respect to this entry, you must acquit him of this charge. In respect to my suggestions on this charge I wish to repeat that you may properly reject them if they strike you as of no weight. You are the sole judges of the fact, and yours is the responsibility. As to the $12,500 item,

Phillips does not say that Youtsey told him expressly about that. Youtsey, he says, only told him to make a change of $50,000, and he used the $12,500, adding it to deposits, and charging the Third National Bank with it, in order to make up the $50,000. The defendant's relation to this is more remote than to the $38,000 item; but if you credit Phillips, and think that the $12,500 item was reasonably within the directions given, he is responsible for both.

Coming now to the twenty-third and twenty-fifth counts, the false entries charged against the defendant are both of them involved in the false entries already referred to. If the defendant had no knowledge of the Phillips entries, or if, by reason of impairment of his memory by disease or for any other cause, you have a reasonable doubt that he did, then he should be acquitted on these counts. If, however, you find him guilty of directing those Phillips entries with intent to deceive, you will have to consider the relation of the entries in the report to the entries of December 7, 1895, and determine how great the proof, if any, of his guilt upon these counts.

The twenty-fourth count stands by itself. It relates to the item of $47,000, legal tenders in the comptroller's report, which Hengelbrok says was false, because he was counting as legal tender upon that day a memorandum of an overdraft of Spinks for $20,000; that he began to do this, by direction of the defendant, on September 26th, after an argument with the defendant; that he expected payment of the overdraft from day to day; that defendant wished it counted because they were expecting to be called on for a report in a few days, and he wished to strengthen the cash; that there were constant calls over the telephone upon Spinks to make the overdraft good, but that he did not do so until January. Did the defendant know that this was in the cash,—that this overdraft was counted in the legal tender when he made the report? He adopted, it is said by both Phillips and Hengelbrok, this method of an overdraft, in order to force Spinks to pay, and the pressure on Spinks was daily. The natural question which suggests itself is: Is it possible that the defendant would not have known whether that overdraft was paid when he made his report in December,—the overdraft by Spinks for $20,000, which he had himself directed to be carried as a memorandum? If it is possible, then he should be acquitted. If, however, he did know it, and yet caused it to be entered, an entry of legal tenders which included that overdraft would be false; and, if calculated to deceive, it is to be presumed that defendant intended the natural consequences of his own act, though this presumption is not conclusive.

In conclusion, I wish to add that the defendant is not on trial for the failure of the bank, nor for mismanagement of its affairs, nor for general losses of stockholders, but only for specific offenses charged in the indictment; and the condition and management or mismanagement of the bank are only to be considered as they reflect light upon and furnish a motive for or otherwise explain the acts of the defendant and the other parties to the transaction we have investigated.

And now, gentlemen of the jury, I am done. I commit the case to you, confident that you will do justice between the United States and the prisoner at the bar. He is most unfortunate in his bodily and

mental affliction.    His family deserve the profound sympathy of every one.    If you shall find that either by reason of his mental condition when the acts here charged as crimes were committed, if they were committed, or by reason of affirmative evidence, you have a reasonable doubt of his guilt on any one charge, acquit him of it; but if he is guilty on any one charge, or more, his unfortunate condition or your natural sympathy for him should not and will not prevent you from doing your duty, unpleasant as it will be.    The case is in your hands.    The clerk will hand you forms of verdict.

The jury returned a verdict of guilty on every count, except the twenty-sixth and twenty-seventh, as to which, in accordance with the instruction of the court, the verdict was not guilty.