UNITED STATES of America

v.

Anita G. WHITLOCK, Appellant.

No. 78–1305.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1978.

Decided Dec. 4, 1980.

Kenneth J. Burchfiel, Jr., Washington, D. C. (appointed by this Court), for appellant.

John H. Korns, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the briefs were filed, John A. Terry, Michael W. Farrell and Stephen R. Spivack, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

PER CURIAM:

Judge Robinson files an opinion in Parts I and IV of which Judges MacKinnon and Robb concur. Judge MacKinnon files an opinion in which Judge Robb concurs. Thus, Parts I and IV of Judge Robinson's opinion together with Judge MacKinnon's opinion constitute the opinion of the court.

The order of the District Court appealed from herein is affirmed.

*So Ordered.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

After a bench trial, appellant was convicted in the District Court of embezzling $85,000 from the DuPont Circle Branch of Riggs National Bank in purported violation of 18 U.S.C. § 656.[1] Acknowledging the theft, she contends that the court should have entered *sua sponte* a judgment of acquittal on the ground that the evidence did not demonstrate that she had prior lawful possession of the money, as was required to establish the crime of embezzlement.[2] Alternatively, she argues that the Government failed to prove that she was mentally responsible when she appropriated the $85,-000[3] and, less expansively, that the court erred in ordering her commitment for a pretrial psychiatric evaluation and in receiving in evidence statements she allegedly made during the course of examinations therefor.[4]

I believe the District Court's disposition should be sustained with the exception of the specification of the Section 656 offense.[5] I would reverse the conviction of embezzlement and remand the case with instructions to enter a judgment convicting appellant of willful misapplication of bank funds under that section, unless the District Court were to determine that a new trial should be granted in the interest of justice. My colleagues, however, uphold the conviction in all respects.

The factual background of the case is set forth in Part I of this opinion. The claims raised by appellant with respect to the Fifth Amendment and the sufficiency of the evidence—concerning which we are all

1. Quoted in relevant part *infra* note 23. The District Court suspended imposition of sentence and placed appellant on supervised probation for three years with specific conditions, including outpatient psychiatric treatment and medication as prescribed by her physician.

2. Discussed in Parts II, III *infra.*

3. Discussed in Part IV *infra.*

4. Discussed in Part IV *infra.*

5. As we shall see, Part II *infra,* § 656 criminalizes four types of misconduct, including embezzlement and willful misapplication of the funds of certain banks.

agreed—are discussed in Part IV. Judge MacKinnon's opinion delineates the view of the court with respect to the affirmance of the conviction of embezzlement, a matter upon which I state my views in Parts II and III hereof.

## I

On the morning of August 11, 1977, Terrence A. Burkett, head teller of Riggs' DuPont Circle Branch, noticed the apparent absence of bundles of currency from the branch's cash reserve vault. He then notified other employees, and an audit revealed that $85,000 was missing.[6] Naturally enough, the ensuing investigation focused immediately upon those with access to the vault.

The door of the vault could be opened only by use of a combination and a key.[7] Only Burkett had memorized the combination, only bank officers—including appellant[8]—held keys; cash was to be put into or removed from the vault by Burkett and an officer together.[9] Officers could, however, obtain a copy of the combination from a staple-sealed envelope in the bank manager's vault in the event that Burkett was unavailable when cash was needed.[10] After a week of probing, bank security personnel had uncovered unusual financial transactions in the personal accounts maintained at Riggs by three of the officers, including appellant.[11] Resultantly, Melvin L. Chrisman, senior vice president of the bank, conferred with appellant and asked her to elucidate the activity in her accounts, including two recent deposits rather sizable in amount.[12] She tendered an explanation, but about an hour later telephoned Chrisman and requested him to set up a meeting with the chairman of the board to discuss the missing money.[13] At this meeting and at a subsequent one with an agent of the Federal Bureau of Investigation, appellant voluntarily admitted that she had taken the $85,000[14] and described in detail how she had accomplished the theft. Approximately two weeks before August 4, she procured from the branch manager's vault the envelope containing the combination to the cash reserve vault. She then unsealed the envelope, obtained the combination, resealed the envelope and returned it to the manager's vault.[15] Between then and August 4 she entered the cash reserve vault three or four times by using the combination and her key, but did not appropriate any funds on those occasions because she could not "work up the nerve to take the money."[16] Finally, on August 4 she gathered the $85,000, put it in a clothing bag and took the bag back to her desk before leaving for the evening.[17]

At trial, appellant did not undertake to retract or dispute this version of the affair, but sought instead to establish a defense of mental incapacity. Several lay witnesses, including four of her co-workers, testified that during the summer of 1977 she underwent a noticeable change of character; she became untypically short-tempered, easily upset and unusually critical of her subordinates, and sometimes seemed forgetful and

6. Trial Transcript (Tr.) 26–27.

7. Tr. 18–19.

8. Tr. 18. Appellant had the title of assistant manager and assistant cashier. Tr. 33. Functionally, she was in charge of the branch's note department. Tr. 33–34.

9. Tr. 18–21, 24.

10. Tr. 19. The combination was changed whenever it became known in this manner to someone other than Burkett. Tr. 19–21.

11. Tr. 62–63.

12. Tr. 62–64.

13. Tr. 66–67.

14. Tr. 67–68, 89.

15. Tr. 90.

16. Tr. 91.

17. Tr. 90. Most of the money was recovered from a bag in a closet at appellant's home and from an account in a Maryland bank. Tr. 91, 97–99. The bank was fully reimbursed for the $85,000 taken. Tr. 117.

nervous.[18] Additionally, Dr. Marshall deG. Ruffin, who had served as appellant's treating psychiatrist for sixteen years, testified that in 1964 he had diagnosed her condition as manicdepressive,[19] a severe mental illness characterized by cyclical mood-swings from depression to elation. Dr. Ruffin avowed that appellant, at the time she took the $85,000 knew that her action was wrong but that as a result of her illness she lacked substantial capacity to conform her behavior to the law.[20] This conclusion was based on Dr. Ruffin's observations of appellant during an office visit on August 9 when appellant told him that she had pilfered the money, and during a telephone conversation on August 13 when he urged her to return it.[21]

Three members of the staff of Saint Elizabeth's Hospital testified in rebuttal for the Government. On the basis of a court-ordered mental examination of appellant in November, 1977, they concluded that she suffered from an hysterical personality and a depressive neurosis, but that these maladies did not deprive her of substantial capacity to appreciate the wrongfulness of the theft or to square her conduct with legal requirements.[22]

## II

Appellant was indicted, tried and convicted on the specific charge of embezzling bank funds in contravention of Section 656.[23] She now insists that the conviction must be set wholly for naught because, she says, the Government did not show that the bank had ever confided the $85,000 to her care.[24] The Government argues that the

---

**18.** Tr. 133, 148, 153, 163–168.

**19.** Tr. 182.

**20.** Tr. 204, 217, 248.

**21.** Tr. 197–199.

**22.** Tr. 279, 343–344, 360–361, 402.

**23.** 18 U.S.C. § 656 (1976) in relevant part provides:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, *embezzles,* abstracts, purloins *or willfully misapplies* any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(Emphasis supplied). Riggs' name suggests that it is within the ambit of § 656 as a "national" rather than an "insured" bank. However that may be, § 656 defines "insured bank" as including "any bank, ... the deposits of which are insured by the Federal Deposit Insurance Corporation," and the indictment charged and the parties stipulated that Riggs' deposits are so insured. Consequently, one way or the other, § 656 is fully applicable to the case at bar.

**24.** Appellant did not move for a judgment of acquittal in the District Court. See Fed.R. Crim.P. 29. For this reason, the Government suggests that the present contention is not properly before us. This court has said that absent such a motion the evidentiary basis for a conviction by jury is open to appellate reexamination only to prevent a manifest miscarriage of justice, *United States v. Baber,* 145 U.S.App.D.C. 98, 101 & n.8, 447 F.2d 1267, 1270 & n.8, *cert. denied,* 404 U.S. 957, 92 S.Ct. 324, 30 L.Ed.2d 274 (1971); *United States v. McCray,* 140 U.S.App.D.C. 67, 69 n.2, 433 F.2d 1173, 1175 n.2 (1970), and that view is widespread in the federal circuits. See 2 C. Wright, Federal Practice, § 469 (1969 & Supp. 1979) and cases cited.

In contrast, for cases—like the instant one—which are tried to the *court* on a plea of not guilty, the rule has been declared to be that failure to move for a judgment of acquittal does not foreclose an attack on the sufficiency of the evidence on appeal. *Hall v. United States,* 286 F.2d 676, 677 (5th Cir. 1960), *cert. denied,* 366 U.S. 910, 81 S.Ct. 1087, 6 L.Ed.2d 236 (1961); *United States v. Besase,* 373 F.2d 120, 121 (6th Cir. 1967); *United States v. Hon,* 306 F.2d 52, 54 (7th Cir. 1962); *In re J.N.H.,* 293 A.2d 878, 880 (D.C.App.1972). That, I think, is as it should be. As the Fifth Circuit has observed, in nonjury cases "[t]he plea of not guilty asks *the court* for a judgment of acquittal, and a motion to the same end is not necessary." *Hall v. United States, supra,* 286 F.2d at 677 (emphasis supplied). Moreover, the courts of appeals are empowered to notice "plain error or defects affecting substantial rights," Fed.R. Crim.P. 52(b), and within that description would seem to fall "the imperative duty of a

evidence portrays her stewardship of the stolen money sufficiently to make out embezzlement. Although the Court agrees with the Government, my view does not coincide completely with either of these positions.

Embezzlement, as an offense, did not exist at common law;[25] consequently, the exact composition of its ingredients depends ultimately upon the statute giving it birth.[26] A seemingly invariable prerequisite of embezzlement statutes is that the accused have received or held the subject property in some particular character before he usurped it. Put another way, embezzlement has become a word of settled technical meaning,[27] connoting that the accused was previously entrusted with possession—either actual or constructive—of the property.[28] I discern nothing in the text of Section 656 rendering the word "embezzlement" ambiguous on this score, or suggesting that Congress envisioned for it anything other than its common meaning.[29] So pervasive in the concept of embezzlement is the need for some type of prior lawful possession[30] that the unmodified use of the word in Section 656 constrains me to conclude that it demands a relationship featuring no less.[31]

With this construction of the statutory language, I share appellant's view that the Government's proof cannot support a conviction of embezzlement. The record is devoid of evidence indicating that appellant's function as a bank officer extended to any type of possession of cash in the reserve vault. Her assigned domain was the branch's note department, and from all that appears neither she nor the employees whom she supervised had any need for reserve-vault cash in the performance of their duties. To be sure, appellant had a key to the vault door and access to the combination, but their use was authorized only for admission of Burkett and other tellers when

court to see that all the elements of [the accused's] crime are proved, or at least that testimony is offered which justifies a . . . finding [on] those elements." *Clyatt v. United States*, 197 U.S. 207, 222, 25 S.Ct. 429, 433, 49 L.Ed. 726, 732 (1905). Equally importantly, the Criminal Rules proclaim that "[t]he court . . . *of its own motion* shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed.R.Crim.P. 29(a) (emphasis supplied). I realize that some of these considerations arguably apply as forcefully to jury as to nonjury trials. See C. Wright, *supra,* § 469 at 265–268. Since, however, I am bound by recent decisions of other panels of this court, *United States v. Caldwell*, 178 U.S.App.D.C. 20, 56 n.19, 543 F.2d 1333, 1369 n.19 (supplemental opinion 1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), and cases cited I undertake no modification of the holding in *Baber* and *McCray, supra.* I simply say that it is inapposite in the situation here.

25. For a discussion of the origin and evolution of embezzlement as a crime, see W. LaFave & A. Scott, Jr., Criminal Law, § 84 (1972).

26. *State v. Parker*, 112 Conn. 39, 151 A. 325, 328 (1930); *State v. January*, 353 Mo. 324, 182 S.W.2d 323, 326 (1944).

27. *United States v. Northway*, 120 U.S. 327, 334, 7 S.Ct. 580, 584, 30 L.Ed. 664, 666 (1887);

*Williamson v. United States*, 332 F.2d 123, 133 & n.15 (5th Cir. 1964); *Williams v. United States*, 275 F. 129, 135 (9th Cir. 1921).

28. *Moore v. United States*, 160 U.S. 268, 269–270, 16 S.Ct. 294, 295, 40 L.Ed. 422, 424 (1895); *Rohde v. United States*, 34 App.D.C. 249, 253 (1910); *Colella v. United States*, 360 F.2d 792, 799–800 (1st Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *United States v. Sayklay*, 542 F.2d 942, 944 (5th Cir. 1976).

29. See *United States v. Northway, supra* note 27, 120 U.S. at 334, 7 S.Ct. at 584, 30 L.Ed. at 666; *United States v. Kehoe*, 365 F.Supp. 920, 922–924 (S.D.Tex.1973).

30. *Moore v. United States, supra* note 28, 160 U.S. at 269–270, 16 S.Ct. at 295, 40 L.Ed. at 424; *Arbuckle v. United States*, 79 U.S.App. D.C. 282, 283, 146 F.2d 657, 658 (1944); *Talbert v. United States*, 42 App.D.C. 1, 14–15, *cert. denied*, 234 U.S. 762, 34 S.Ct. 997, 58 L.Ed. 1581 (1914); *Rohde v. United States, supra* note 28, 34 App.D.C. at 253.

31. Accord, *United States v. Sayklay, supra* note 28; *United States v. Breese*, 173 F. 402, 405–406 (C.C.W.D.N.C.1909); *United States v. Harper*, 33 F. 471, 474–476 (C.C.S.D.Ohio 1887); *United States v. Orbiz*, 358 F.Supp. 200, 202–203 (D.P.R.1973). See also *United States v. Northway, supra* note 27, 120 U.S. at 334, 7 S.Ct. at 584, 30 L.Ed. at 666.

they themselves ran low on cash.[32] Appellant thus cannot be deemed to have been entrusted with the missing funds in such a way as to justify a conviction for embezzlement. Mere ability to perpetrate a theft of bank funds is not the possession that embezzlement inexorably demands.[33]

Our inquiry does not halt here, however, for Section 656 also makes punishable other kinds of misappropriation of protected bank funds. By its very terms, the section is transgressed not only when a national bank officer[34] "embezzles" but also when he "abstracts, purloins or willfully misapplies any of the [bank's] moneys [or] funds...."[35] Notwithstanding the incapability of the evidence to establish embezzlement, the uncontradicted proof of appellant's misdeed established beyond peradventure a willful misapplication of bank funds, and thus an offense necessarily included within the embezzlement charged.

The fundamental difference between embezzlement and willful misapplication under Section 656 has long been recognized. While embezzlement contemplates only the situation wherein the officer has lawful possession of the funds before misappropriating them,[36] no such prior relationship is needed when the charge is willful misapplication.[37] Nearly a century ago in *United States v. Northway*,[38] the Supreme Court addressed the nearly identical language of Section 656's statutory predecessor and flatly held that "[a] wilful and criminal misapplication of the funds of the [bank] may be made by an officer or agent of the bank without having previously received them into his manual possession."[39] Said the Court,

if ... it be necessary to the commission of the offence of wilfully misapplying the funds of the bank that they should have come previously into the possession of the defendant in his official capacity, so that he could be said to have been intrusted with their possession, all distinction between the offences of wilfully misapplying the funds and of embezzlement would disappear. But it is evidently the intention of the statute not to use the words "embezzle" and "wilfully misapply" as synonymous. In order to misapply the funds of the bank it is not necessary that the officer charged should be in actual possession of them by virtue of a trust committed to him. He may abstract them from the other funds of the bank unlawfully, and afterwards criminally misapply them, or by virtue of his official relation to the bank, he may have such control, direction, and power of management as to direct an application of the funds in such a manner and under such circumstances as to constitute the offence of wilful misapplication.[40]

32. My colleagues criticize my position on the ground that I would insist upon actual possession as an essential element of embezzlement. See opinion of Judge MacKinnon. On the contrary, I recognize that constructive possession may suffice. My point is that appellant did not have any lawful possession whatever of money in the reserve vault, but only the means of access thereto.

33. *Government of Virgin Islands v. Leonard*, 548 F.2d 478, 480–481 (3d Cir. 1977); *United States v. Sayklay, supra* note 28, 542 F.2d at 944.

34. The prohibitions of § 656 extend, of course, to institutions other than national banks, and to personnel other than officers. See note 23 *supra*.

35. See note 23 *supra*.

36. See cases cited *supra* notes 28–31 and accompanying text.

37. *United States v. Northway, supra* note 27, 120 U.S. at 334, 7 S.Ct. at 584, 30 L.Ed. at 666; *United States v. Reece*, 280 F. 913, 916 (D. Idaho 1922); *United States v. Fish*, 24 F. 585, 591 (C.C.S.D.N.Y.1885); *United States v. Breese, supra* note 31, 173 F. at 406; *United States v. Harper, supra* note 31, 33 F. at 477–479. See *Evans v. United States*, 153 U.S. 584, 589–590, 14 S.Ct. 934, 937, 38 L.Ed. 830, 832 (1894).

38. *Supra* note 27.

39. 120 U.S. at 331–332, 7 S.Ct. at 583, 30 L.Ed. at 665.

40. *Id.* at 332, 7 S.Ct. at 583, 30 L.Ed. at 665–666.

The implication of *Northway* and its progeny[41] for the instant litigation is readily apparent. "Misapplication" in Section 656 covers activities not necessarily amounting to "embezzlement."[42] Though the Government's case is deficient when the proof is measured solely by the requirements of embezzlement, it is manifest that the evidence disclosed a willful and fraudulent misapplication of the $85,000 within the ambit of Section 656.[43] Using *Northway's* description of the offense of misapplication, appellant "abstract[ed] [the money] from the other funds of the bank unlawfully, and afterwards criminally misappl[ied] them . . . ."[44] It follows that appellant's conviction must be sustained if, notwithstanding that the charge of the indictment was embezzlement under that section, the conviction may nevertheless be properly bottomed upon misapplication, which the section equally proscribes and punishes. To that question I now turn.

## III

For unassailable reasons, an accused may not be convicted of a crime with which he has not been charged.[45] The Fifth Amendment bars prosecution of civilians for infamous offenses save by indictment or presentment of a grand jury.[46] The Sixth Amendment requires notification of the nature and cause of the accusation, whether felony or misdemeanor, to enable the accused to prepare his defense.[47] The indictment not only serves this notice function[48] but also safeguards against oppression by the prosecutor[49] and against future jeopardy for the same offense.[50]

This does not mean, however, that a conviction must always be limited to the highest crime described in the indictment. Criminal Rule 31(c) provides, *inter alia*, that the accused "may be found guilty of an offense necessarily included in the offense charged."[51] This provision is but a restate-

**41.** See cases cited *supra* note 37.

**42.** *Williamson v. United States, supra* note 27, 332 F.2d at 133 n.15.

**43.** In this view, it is not necessary to consider whether appellant's conduct amounted to an "abstract[ion]" or "purloin[ing]" within the meaning of § 656. See generally, *United States v. Northway, supra* note 27, 120 U.S. at 334–336, 7 S.Ct. at 584–585, 30 L.Ed. at 666–667.

**44.** See text *supra* at note 40.

**45.** *Albrecht v. United States*, 273 U.S. 1, 8, 47 S.Ct. 250, 252, 71 L.Ed. 505, 509 (1927); *Jackson v. United States*, 123 U.S.App.D.C. 276, 278, 359 F.2d 260, 262, *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966); *Spence v. Dowd*, 145 F.2d 451, 453 (7th Cir. 1944).

**46.** "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger. . . ." U.S. Const., amend. 5.

**47.** "In all criminal prosecutions, the accused shall enjoy the right to . . . be informed of the nature and cause of the accusation. . . ." U.S. Const., amend. 6.

**48.** *United States v. Haldeman*, 181 U.S.App. D.C. 254, 346, 559 F.2d 31, 123 (en banc 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Gaither v. United States*, 134 U.S.App.D.C. 154, 164–165, 413 F.2d 1061, 1071–1072 (1969); *Pino v. United States*, 125 U.S.App.D.C. 225, 227–228, 370 F.2d 247, 249–250 (1966), *cert. denied*, 387 U.S. 922, 87 S.Ct. 2038, 18 L.Ed.2d 977 (1967); *United States v. Radowitz*, 507 F.2d 109, 111–112 (3d Cir. 1974).

**49.** *United States v. Dionisio*, 410 U.S. 1, 16, 17 & n.15, 93 S.Ct. 764, 773 & n.15, 35 L.Ed.2d 67, 81 & n.15 (1973); *Stirone v. United States*, 361 U.S. 212, 218 & n.3, 80 S.Ct. 270, 273 & n.3, 4 L.Ed.2d 252, 257 & n.3 (1960); *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041, 1048 (1959); *United States v. Radowitz, supra* note 48, 507 F.2d at 112.

**50.** *Gaither v. United States, supra* note 48, 134 U.S.App.D.C. at 165, 413 F.2d at 1072; *United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962); *United States v. Radowitz, supra* note 48, 507 F.2d at 112; *Van Liew v. United States*, 321 F.2d 664, 669 (5th Cir. 1963).

**51.** "The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." Fed.R.Crim.P. 31(c).

ment of prior law [52] rooted in a practice developed at common law to assist the prosecution when its proof of some element of the crime charged fell short.[53] At the core of the doctrine is the precept that the indictment charging the higher offense adequately notifies the accused that he may be called upon to defend against the included offense as well.[54]

This ability to enter a conviction of a necessarily-included offense is not confined solely to trial courts and juries. Federal appellate courts are statutorily authorized to "modify ... any judgment ... of a court lawfully brought before it for review,

and [to] remand the cause and direct the entry of such appropriate judgment ... as may be just under the circumstances." [55] It is well settled that upon review of a conviction for insufficiency of the evidence to sustain some element of the offense charged, the court is empowered to reduce the conviction to a necessarily-included crime when all elements thereof draw ample support from the evidence and the modification poses no prejudice to the accused.[56] And I am satisfied that a national bank officer's willful misapplication of bank funds is a necessarily-included offense of embezzlement of such funds, and that appellant's conviction can stand on that basis.

52. *Berra v. United States*, 351 U.S. 131, 134–135 & n.6, 76 S.Ct. 685, 688 & n.6, 100 L.Ed. 1013, 1018 & n.6 (1956).

53. *Austin v. United States*, 127 U.S.App.D.C. 180, 191–193, 382 F.2d 129, 140–142 (1967); *Kelly v. United States*, 125 U.S.App.D.C. 205, 207, 370 F.2d 227, 229 (1966), *cert. denied*, 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1967).

54. *Walker v. United States*, 135 U.S.App.D.C. 280, 283, 418 F.2d 1116, 1119 (1969); *Fuller v. United States*, 132 U.S.App.D.C. 264, 294–295, 407 F.2d 1199, 1229–1230 (*en banc* 1968), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969).

55. "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106 (1976).

56. *United States v. Bryant*, 137 U.S.App.D.C. 124, 132–133, 420 F.2d 1327, 1335–1336 (1969), *rev'd on other grounds, U.S. v. Gray*, 155 U.S. App.D.C. 275, 477 F.2d 444 (1977); *Allison v. United States*, 133 U.S.App.D.C. 159, 164–165, 409 F.2d 445, 450–451 (1969), *rev'd on other grounds, U.S. v. Gray*, 155 U.S.App.D.C. 275, 477 F.2d 444 (1977); *Fuller v. United States, supra* note 54, 132 U.S.App.D.C. at 293 & n.29, 407 F.2d at 1228 & n.29; *Austin v. United States, supra* note 53, 127 U.S.App.D.C. at 191–193, 382 F.2d at 140–142.

The authority of a federal appellate court to reduce a conviction to a necessarily-included crime is not disturbed by the Supreme Court's recent decision in *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979). Although the Court there stated that "appellate

courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial," *id.* at 107, 99 S.Ct. at 2194, 60 L.Ed.2d at 751, the circumstances of that case differ in significant respects from the situation that confronts us here. In *Dunn*, the court of appeals had affirmed a conviction by reference to facts which had been adduced at trial but which had not constituted any part of the foundation for the original conviction and had not been charged in the indictment. This clearly violated the constitutional guaranties underlying the rule that a defendant can be convicted only of an offense for which he has been tried. *Id.* at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750–751. In reversing, the Supreme Court relied on earlier cases which likewise emphasized that an accused may not be charged with one offense but convicted by an appellate court of a separate and distinct offense, comprised of different elements or based on different facts, *id.*; see *Eaton v. City of Tulsa*, 415 U.S. 697, 698–699, 94 S.Ct. 1228, 1229–1230, 39 L.Ed.2d 693, 695–696 (1974); *Cole v. Arkansas*, 333 U.S. 196, 200–201, 68 S.Ct. 514, 516–517, 92 L.Ed. 644, 647–648 (1948)—holdings premised on the requirement that the accused receive notice of the charge against him so that he may defend against it. *Id.* at 201, 68 S.Ct. at 517, 92 L.Ed. at 647. In contrast, a conviction of a necessarily-included offense is permitted precisely because the original indictment provides such notice, and because the included offense is part of, and neither separate nor distinct from, the crime as charged. See notes 43–52 *supra* and accompanying text. Moreover, the facts that would establish a conviction of the included offense by definition will embrace all facts warranting a finding of guilt on the included offense. See notes 57–60 *infra* and accompanying text. Consequently, *Dunn* and its predecessors do not limit this well established doctrine.

A necessarily-included offense is one perforce established by proof of another offense having added components.[57] The indispensable characteristic of the included offense is that all of its essential elements are among the more numerous elements of the other offense.[58] That clearly is the situation here. The elements of the crime of misapplication under Section 656 are (a) conversion of bank funds to the use of someone other than the bank and (b) intent to injure and defraud the bank.[59] Embezzlement under Section 656 has both of these elements and differs from misapplication only by the addition of prior lawful possession of the funds by the embezzler.[60] Because proof of embezzlement must establish both elements of misapplication, the latter

falls well within the traditional concept of the necessarily-included offense.

The previous invocations of authority to affirm for included offenses have, however, involved situations in which both of the relevant offenses have had their origins in the common law,[61] while embezzlement[62] and bank-funds misapplication[63] are statutory crimes. Moreover, both offenses are specified in a single statutory section lacking any hint that aside from the difference in number of elements either is a greater or lesser charge than the other; indeed, both carry the same penalty. Nonetheless, I see nothing in these circumstances to affect the case before us. In the past we have exercised our reduction powers with respect to offenses blending statutory with common law components,[64] and I see no reason to

**57.** Perhaps much more frequently, courts refer to this offense as a "lesser-included offense," and so it usually is. Ordinarily, that offense has not only a larger number of elements but also a greater maximum penalty. Here, however, while embezzlement does indeed have more elements, misapplication is of exactly the same grade as embezzlement and is punishable just as severely. See note 23 supra. To avoid any possible misimpression, we refer to misapplication as a "necessarily-" rather than a "lesser-included offense." This does not herald any departure from the well settled principles comprising this branch of criminal procedure, for the doctrine of lesser-included offenses is best typified by the offense necessarily included as a matter of law. See 8A J. Moore, Federal Practice ¶ 31.03[2] (1978 rev.).

**58.** Sansone v. United States, 380 U.S. 343, 349–350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882, 887–888 (1965); Berra v. United States, supra note 52, 351 U.S. at 134, 76 S.Ct. at 688, 100 L.Ed. at 1018; Stevenson v. United States, 162 U.S. 313, 315, 16 S.Ct. 839, 840, 40 L.Ed. 980, 981 (1896); United States v. Whitaker, 144 U.S.App.D.C. 344, 347, 447 F.2d 314, 317 (1971); Fuller v. United States, supra note 54, 132 U.S.App.D.C. at 293, 407 F.2d at 1228.

**59.** United States v. Heinze, 218 U.S. 532, 540–544, 31 S.Ct. 98, 100–102, 54 L.Ed. 1139, 1143–1144 (1910); United States v. Northway, supra note 27, 120 U.S. at 332, 7 S.Ct. at 583, 30 L.Ed. at 665–666; Bishop v. United States, 16 F.2d 410, 412 (8th Cir. 1926), modified in other respects, 19 F.2d 224 (8th Cir. 1927).

**60.** United States v. Northway, supra note 27, 120 U.S. at 332, 7 S.Ct. at 583, 30 L.Ed. at 665–666; Jewett v. United States, 100 F. 832, 840 (1st Cir.), cert. denied, 179 U.S. 683, 21

S.Ct. 916, 45 L.Ed. 385 (1900); United States v. Youtsey, 91 F. 864, 867 (C.C.D.Ky.1898).

**61.** As a conspicuous example, we have reduced a conviction of assault with intent to commit rape to one of assault. United States v. Bryant, supra note 56, 137 U.S.App.D.C. at 132–133, 420 F.2d at 1335–1336. See also Walker v. United States, 135 U.S.App.D.C. 280, 283–284, 418 F.2d 1116, 1119–1120 (1969) (robbery necessarily includes larceny); Joyner v. United States, 116 U.S.App.D.C. 76, 77, 320 F.2d 798, 799 (1963) (robbery charged as a taking by force and violence necessarily includes assault with intent to rob); Lamore v. United States, 78 U.S.App.D.C. 12, 136 F.2d 766 (1943) (robbery necessarily includes larceny). In none of these cases, however, did the court rely on the common law origin of any of the crimes.

**62.** See notes 25–26 supra and accompanying text.

**63.** See note 23 supra.

**64.** United States v. Melton, 160 U.S.App.D.C. 252, 264, 491 F.2d 45, 57 (1973) (order on rehearing) (reducing conviction of burglary under D.C.Code § 22–1801 (1973) to conviction of unlawful entry under § 22–3102); see United States v. Thomas, 144 U.S.App.D.C. 44, 49, 444 F.2d 919, 924 (1971) (suggesting that conviction of first degree burglary under D.C.Code § 22–1801(a) (1973) could under proper circumstances be reduced to conviction of lesser included offenses of second degree burglary under § 22–1801(b) or unlawful entry under § 22–3102). In prosecutions charging murder, degrees of which were unknown to the common law, e. g., Bishop v. United States, 71 App.D.C.

treat differently a statutory offense without any common law moorings at all.[65] Although Section 656 maintains a definitional distinction between embezzlement and misapplication,[66] there is no indication that Congress contemplated that technical considerations would prevent application of the well-entrenched doctrine of necessarily-included offenses.[67]

Because misapplication is, then, an offense necessarily embraced within a charge of Section 656 embezzlement, by finding appellant guilty of embezzlement the trial judge inescapably was satisfied on the existence of the two essential elements of misapplication. Consequently, if there was enough evidence to support those elements, the failure of proof of the additional element required for embezzlement becomes wholly immaterial to the outcome. And the stark fact of the matter is that appellant did not dispute the deliberate and fraudulent conversion of funds that so plainly establish the offense of misapplication, and does not undertake to do so now.[68] Thus,

though I differ with the court in that I find insufficient evidence of prior lawful possession of the $85,000, I would still uphold the Section 656 conviction—as one of misapplication rather than embezzlement—so long as there is no undue prejudice from the failure to charge her specifically with that offense.[69]

The record on appeal reflects no such prejudice. The indictment for embezzlement gave clear notice of every fact the Government expected to prove, whether any resulting conviction would ultimately be for embezzlement or willful misapplication,[70] and no fact pertinent to misapplication has been contested in the least. Furthermore, the indictment, as required,[71] cited Section 656 as the statutory provision assertedly violated,[72] and that section criminalizes the proven misapplication no less than the alleged embezzlement of the $85,000. Appellant's primary defense at trial was that she lacked mental capacity to commit embezzlement, and there is no indication that the defense presentation would

132, 136, 107 F.2d 297, 301 (1939), we have reduced first degree to second degree. *Hemphill v. United States*, 131 U.S.App.D.C. 46, 50, 402 F.2d 187, 191 (1968); *Austin v. United States, supra* note 53, 127 U.S.App.D.C. at 191–194, 382 F.2d at 140–143. See also *Fuller v. United States, supra* note 54, 132 U.S.App.D.C. at 292–297, 407 F.2d at 1227–1232.

**65.** See *Allison v. United States, supra* note 56, 133 U.S.App.D.C. at 164–166, 409 F.2d at 450–452 (reduction of conviction of assault with intent to commit carnal knowledge to one of taking indecent liberties with a minor child); *United States v. Industrial Laboratories Co.*, 456 F.2d 908, 911–912 (10th Cir. 1972) (reducing conviction of the felony of introducing an adulterated drug into interstate commerce with intent to defraud or mislead to the misdemeanor of introducing an adulterated drug into interstate commerce without such intent, both violations of 21 U.S.C. § 331(a) (1976)).

**66.** See *United States v. Northway, supra* note 27, 120 U.S. at 332, 7 S.Ct. at 583, 30 L.Ed. at 665–666.

**67.** I am aware of the disposition made in *United States v. Sayklay, supra* note 28. There the court reversed a conviction for embezzlement, resting on facts clearly demonstrating guilt of willful misapplication of bank funds, because the prosecution failed to show prior lawful possession. The court, correctly in my view, observed that its action was compelled because Congress chose to carry forward the distinction between the two crimes. 542 F.2d at 944. The court did not, however, consider the possibility of reducing the conviction to misapplication as a lesser-included offense.

**68.** See Brief for Appellant at 2–3, 18.

**69.** See cases cited *supra* note 56.

**70.** The indictment read:

On or about August 4, 1977, within the District of Columbia, ANITA G. WHITLOCK, being an officer and employee of the Riggs National Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, with intent to injure and defraud said bank, wilfully and knowingly did embezzle and convert to her own use the sum of $85,000.00 of the moneys and funds of such bank. (Violation of Title 18, U.S. Code, Section 656).

**71.** Fed.R.Crim.P. 7(c)(1) provides in relevant part that "[t]he indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated."

**72.** See note 70 *supra*.

have been different had misapplication been charged.[73] In sum, I perceive no prejudice to appellant were we to affirm the conviction for misapplication rather than embezzlement. Nonetheless, if the court had adopted this disposition I would have preferred to follow a precautionary procedure we have established in earlier cases;[74] I would therefore remand the case to the District Court with instructions to enter a conviction for misapplication or, instead, to grant a new trial if, from his vantage point less remote from the trial, he deemed that in the best interests of justice.[75]

## IV

We are in complete agreement with respect to appellant's contention that the evidence was insufficient to establish that she was criminally responsible for the activity for which she was prosecuted. We note at the outset that this appeal presents no occasion for determining either the degree or the allocation of the burden of proof in that regard,[76] for the District Court ruled that the Government had the onus of demonstrating appellant's mental competence beyond a reasonable doubt[77] and found that the Government had done so. We need only decide whether appellant was "so clearly and so seriously disabled" at the time she took the $85,000 that the court was "compelled to doubt [her] responsibility,"[78] and we hold that appellant was not so disabled.

The psychologist and two psychiatrists who testified for the Government[79] stated that they had perceived no indication that appellant suffered from any serious mental illness, such as psychosis or manic-depression, which would cause her to lose touch with reality.[80] All three had discerned an abnormal condition, but uniformly they diagnosed it as an hysterical personality—a personality trait consistent with behavior described by appellant's lay witnesses,[81] and one which is much less severe than a psychosis and which would not substantially impair control of her behavior.[82] The Government's evidence further showed that appellant had pondered an appropriation of bank funds for approximately two months,[83] and that the need she felt for more money was quite normal. She wished to buy her father's interest in the house where her mother lived so that the latter, who was in poor health, could be freed from what appellant viewed as an unhappy marriage.[84] She also wanted to pay off her own debts, which then were in excess of $21,000.[85]

---

**73.** Compare *Allison v. United States, supra* note 56, 133 U.S.App.D.C. at 165, 409 F.2d at 451 with *Austin v. United States, supra* note 53, 127 U.S.App.D.C. at 194, 382 F.2d at 143.

**74.** See *Allison v. United States, supra* note 56, 133 U.S.App.D.C. at 165–166, 409 F.2d at 451–452; *Austin v. United States, supra* note 53, 127 U.S.App.D.C. at 193–194, 382 F.2d at 142–143.

**75.** As will now appear, Part IV *infra*, appellant's remaining grievances do not warrant reversal.

**76.** In earlier cases we expressly reserved decision on the question whether imposing on the defendant the burden of establishing his insanity defense to federal criminal charges constitutes a denial of the equal protection of the laws. See *United States v. Caldwell, supra* note 24, 178 U.S.App.D.C. at 52–54, 543 F.2d at 1365–1367; *United States v. Greene*, 160 U.S.App.D.C. 21, 29, 489 F.2d 1145, 1153 (1973), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974); *United States v. Brawner*, 153 U.S.App.D.C. 1, 28, 471 F.2d 969, 996 (*en banc* 1972). Once again, we need not address this issue. See text *infra* at note 77.

**77.** Tr. 5–13.

**78.** *United States v. Green*, 150 U.S.App.D.C. 222, 225, 463 F.2d 1313, 1315 (1972), quoting *United States v. Eichberg*, 142 U.S.App.D.C. 110, 111, 439 F.2d 620, 621 (1971).

**79.** See text *supra* at note 22.

**80.** Tr. 286, 338, 399.

**81.** See note 18 *supra* and accompanying text.

**82.** Tr. 279–280, 343, 399.

**83.** Tr. 283.

**84.** Tr. 282, 351–352.

**85.** Tr. 91–93, 426–427.

In preparation for the offense, appellant had taken the envelope containing the reserve-vault combination from the manager's vault, carefully opened it, and resealed it by reinserting staples very near the location of the original staples in an obvious effort to conceal the fact that it had been tampered with.[86] Using the combination and her key, she had entered the vault on three or four occasions before she was finally able to summon enough courage to steal the $85,000.[87] After the loss of the money was discovered, she denied to the FBI agent investigating the incident that she was the culprit.[88] In addition, appellant held a responsible position with the bank during this time, and there is no indication of seriously abnormal behavior or of inability to perform her job. We believe these facts adequately support the conclusion that, as one witness put it, she "always was completely in control of the situation." [89]

Appellant makes several pointed attacks on the reliability of this evidence. She claims that the Government's experts were incompetent to testify because they did not spend much time interviewing her and did not contact her treating psychiatrist; that their testimony was tainted by their alleged suspicion that she would try to deceive them into believing that she was mentally ill; that Dr. McIlroy, one of the Government psychiatrists, was an "incredible witness" because assertedly he testified that he molded his opinions to reach the desired result; and that the lay evidence strongly contradicted the Government experts' account. We find no merit in these claims. First, we are unwilling to hold that in order for a psychiatrist or psychologist to qualify as an expert witness he must spend some particular number of hours with the patient, or must invariably consult the patient's private psychiatrist. An expert must, of course, have an adequate factual basis for his conclusion,[90] but we cannot say that such a basis was lacking here. Each of the Government's experts observed appellant for an appreciable period, and together they devoted a total of approximately eight hours to interviewing her.[91] Their diagnoses were predicated not only on these interviews but also on a battery of psychological tests and on ward notes made by the nursing staff during appellant's two-week stay at the hospital.[92] Furthermore, we deem their failure to contact appellant's treating psychiatrist reasonable in light of the fact that each had either read the latter's report [93] or had decided that a more objective evaluation would result from seeing the appellant "blind." [94] Appellant's other complaints about the Government's experts give us little pause; we have reviewed the record and find that invariably they mischaracterize the witnesses' statements.[95] It fol-

86. Tr. 79–80, 90.

87. Tr. 90–91. Dr. Richard Ratner, a psychiatrist at St. Elizabeths Hospital who testified for the Government, suggested that these trips to the vault were actually "dry runs" during which appellant planned her strategy so that she could remove the money without being caught. Tr. 283.

88. Tr. 57.

89. Tr. 357 (testimony of Dr. Richard McIlroy).

90. See Fed.R.Evid. 602, 701, 703.

91. Tr. 278–279, 310–311, 335, 387, 393.

92. Tr. 278, 359–360.

93. Tr. 285, 353–354.

94. Tr. 389–390.

95. For example, appellant asserts that "Dr. Ratner," one of the Government experts, "testified that an integral part of his reasoning as a forensic psychiatrist was a suspicion of his clients, based on embarrassment at his own naivete, or simple paranoia about the machinations of clients who 'pride themselves on the ability to fool psychiatrists into thinking they are mentally ill.'" Brief for Appellant at 38. In fact, Dr. Ratner's statement about patients who attempt to mislead psychiatrists was made in explanation of why he believed his forensic experience would give him greater diagnostic ability than that of a practicing psychiatrist, even one who had been such for a greater period of time. He explained that "[p]sychiatrists who don't have a lot of experience in the forensic area tend to be more or less taking a person at his word, taking what a person tells him at face value," Tr. 325, whereas, with the additional expertise involved in forensic psychi-

lows that, with the experts qualified, "[t]he weight and sufficiency of [their] testimony [were] matters to be decided by the trier of fact." [96]

Appellant also advances several contentions emanating from the District Court's order committing her for a pretrial psychiatric evaluation and from testimony based on statements adduced from her during the examinations. The purpose of the order was to develop information bearing on her competence to stand trial and, as well, on her criminal responsibility for the taking of the $85,000.[97] Appellant argues that the court went amiss in ordering the commitment under the District of Columbia Code [98] rather than the United States Code,[99] and further, as we understand it, that in any event the inquiry should not have extended to her mental state at the time of the offense.[100] She also argues that the examinations and the testimony violated her privilege against self-incrimination.

 We begin by noting that none of these alleged errors was objected to in the District Court.[101] It appears, too, that the commitment order of which appellant now so fervently complains was drafted by her trial counsel.[102] Moreover, her complaint that the local statute, unlike its federal counterpart, imposes the burden of proving

an insanity defense upon the accused rings hollow since the court followed the federal standard;[103] and the difference she perceives between the laws regarding psychiatric commitment if the defense is successful was negated by her conviction. Finally, appellant's contention that her pretrial commitment should have been limited solely to an examination as to competence to stand trial overlooks the fact that federal courts have inherent power—indeed, a solemn obligation—to call for a psychiatric evaluation of criminal responsibility "in a case where it is obvious that the trial will revolve about the issue of the accused's mental state at the time of the crime." [104] In these circumstances, we have no cause to disturb the commitment order.

Appellant also charges that the District Court erred in failing to include with that order a copy of the explanatory instruction to psychiatrists required by our *Washington* decision,[105] in failing to instruct the expert witnesses prior to rendition of their testimony,[106] and in admitting psychiatric testimony impermissible in scope and case in prohibited terms.[107] All of these contentions could readily have been addressed had appellant registered suitable objections at trial. Beyond that, no prejudice likely resulted, for appellant was tried by the court rather than by a jury, and the experts could

---

atry, "[o]ne tends less to rely on the dynamics as we perceive them in an individual and have to rely more on what is observable." Tr. 326.

**96.** *United States v. Green, supra* note 78, 150 U.S.App.D.C. at 225, 463 F.2d at 1316.

**97.** *United States v. Whitlock*, Crim. No. 77–646 (D.D.C.) (order of Nov. 4, 1977).

**98.** D.C.Code 24–301 (1973).

**99.** 18 U.S.C. § 4244 (1976).

**100.** Brief for Appellant at 48–49. Neither statute expressly provides for more than examinations probing competence to stand trial. The commitment order, in going beyond, followed a longstanding practice in this circuit predicated upon the court's inherent powers in this area. See *Williams v. United States*, 102 U.S.App. D.C. 51, 55–56, 250 F.2d 19, 23–24 (1957); see text *infra* at note 104.

**101.** See Fed.R.Crim.P. 51.

**102.** Transcript of Proceedings, Nov. 1, 1977, at 3–4:

> THE COURT: All right—counsel will prepare an order.
> [GOVERNMENT COUNSEL]: I have no objection to that, Your Honor.
> [DEFENSE COUNSEL]: Fine—I will be glad to do that Your Honor. . . .

**103.** See notes 74–75 *supra* and accompanying text.

**104.** *Winn v. United States*, 106 U.S.App.D.C. 133, 135, 270 F.2d 326, 328 (1959), *cert. denied*, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961).

**105.** *Washington v. United States*, 129 U.S.App. D.C. 29, 41–42, 390 F.2d 444, 455–456 (1967).

**106.** See *id.* at 43, 390 F.2d at 457.

**107.** See *id.* at 41–42, 390 F.2d at 455–456.

hardly have usurped the role of the fact-finder.

■ Appellant's claim that the testimony of the Government's experts infringed her right against self-incrimination fares but little better. We recognize that some of the experts' testimony incorporated statements by appellant regarding the manner in which she planned and committed the offense.[108] Had this testimony been admitted for its tendency to buttress appellant's guilt, the self-incrimination question would generate grave concern.[109] But the challenged testimony was elicited solely for the purpose of supporting the experts' conclusion that appellant was criminally responsible for her actions at the time of the offense.[110] Furthermore, since appellant raised no issue as to guilt or innocence apart from her claim of mental illness, we detect no harm from its introduction, and certainly no plain error.[111]

MacKINNON, Circuit Judge. (concurring specially).

■ I concur in Parts I and IV of Judge Robinson's opinion. In my analysis the evidence does support a conviction for embezzlement as well as for the included offense of willful misapplication. In reaching that conclusion I give neither the statute (18 U.S.C. § 656) nor *Moore v. United States*, 160 U.S. 268, 269–70, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895) the highly restrictive construction that is urged in appellant's brief and adopted by Judge Robinson's opinion. Courts have affirmed convictions of embez-

zlement where the accused had "control by virtue of a position of trust" as well as where there was actual "prior lawful possession" of the property. The defendant here had all the means for effective access to and control of the money by virtue of a special trust placed in her by her employer. Consequently, when she used her access and control to convert that money to her own use in violation of that trust she committed embezzlement as well as willful misapplication. *Moore v. United States, supra,* defines "embezzle" expansively to include

the fraudulent appropriation of property by a person *to whom such property has been intrusted or* into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

160 U.S. at 269–70, 16 S.Ct. at 295 (emphasis added). Thus, *Moore* extends embezzlement to those situations where the property has been "intrusted" to the accused's control or custody as well as to those situations where the property "has lawfully come" "into [the accused's] hands."

The statute construed in *Moore* provided that "any person who shall *embezzle*, steal, or purloin any . . . property of the United States, shall be deemed guilty of felony. . . ." *Id.* 16 S.Ct. at 295 (emphasis added). The language of such statute was identical in relevant part to the then-exist-

---

**108.** *E. g.*, Tr. 282–284.

**109.** See *United States v. Reifsteck*, 535 F.2d 1030, 1034 n.2 (8th Cir. 1976).

**110.** See, *e. g.*, Tr. 302, where Dr. Ratner stated that appellant's "methodical" execution of "a detailed and successful plan to break the law" is inconsistent with a conclusion that she acted from an irresistible impulse.

**111.** Concomitantly, appellant complains that the District Court entered a judgment of conviction without at any time enunciating the principles by which criminal responsibility is properly to be assessed. We find no fault in this regard. It is readily apparent from the record that the court was familiar with the standard which we formulated in *United States*

*v. Brawner, supra* note 76. The court employed that standard both in its instructions to the psychiatric staff at Saint Elizabeth's Hospital upon committing appellant to that institution, *United States v. Whitlock*, Crim. No. 77–646 (D.D.C.) (order of Nov. 4, 1977), and in its instructions to Dr. Ruffin, the psychiatrist who testified on behalf of appellant, Tr. 177. Apparently there was no disagreement between counsel for the Government and for appellant over the test for criminal responsibility, and consequently no need for either to request a specific ruling on the yardstick applicable. In the absence of such a request and in light of clear indications that the court was fully conversant with the applicable law, we cannot say that it plainly erred.

ing bank embezzlement statute, codified as R.S. § 5209:

> Every president, director, cashier, teller, clerk, or agent of any association, who *embezzles*, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association ... shall be deemed guilty of a misdemeanor. . . .

Relying in part on two embezzlement cases decided under § 5209,[1] the *Moore* Court concluded that the embezzlement indictment before it should have alleged that the money embezzled came into the accused's possession by virtue of his employment. The Court did not demand more. There was no requirement that there be actual prior and lawful possession;[2] it was enough, the opinion implies, that the stolen property had been "intrusted" to the defendant's special care. There is no reason to believe the scope of embezzlement under the statute construed in *Moore* would be any broader than it was under § 5209, the predecessor to the statute we now consider. In fact because the charge rested solely on the word "embezzle" the decision in *Moore* dealt with a less expansive statute than 18 U.S.C. § 656 which is involved here.

■ Following *Moore*, revisions to § 5209 have made more explicit the trust concept of embezzlement that *Moore* recognized. The present statute provides:

> Whoever, being an officer, director, agent or employee of ... any [bank covered by this statute,] ... *embezzles*, abstracts, purloins or willfully misapplies any of the

moneys ... of such bank or any moneys ... *intrusted* to the custody or care of such bank, or *to the custody or care* of any such agent, *officer*, director, [or] *employee* ... shall be fined not more than $5,000 or imprisoned not more than five years, or both ...

18 U.S.C. § 656 (emphasis added). Under the present statute, embezzlement clearly extends to property *entrusted* to one's "custody" or "care" as well as to property in one's actual lawful possession.[3] That conclusion is fortified by reference to some of the numerous state decisions that have explicitly extended embezzlement to custody and care situations.

## II

These state decisions hold that embezzlement may be committed by one who has control of property by virtue of a trust even if he lacked actual possession of the property or took possession without authorization. Most of the cases involve state statutes that in effect adopt the trust concept which is set forth in *Moore* and which is also evident in the language of § 656. These statutes, by contemplating that embezzlement may be committed by conversion of property in the control of the accused by virtue of a special trust, do not require actual prior possession. But then neither is such possession required by the Supreme Court's definitional decision in *Moore* or by the present language of § 656.

---

1. *United States v. Northway*, 120 U.S. 327, 7 S.Ct. 580, 30 L.Ed. 664 (1887); *Claassen v. United States*, 142 U.S. 140, 12 S.Ct. 169, 35 L.Ed. 966 (1891). See 16 S.Ct. at 295.

2. "If ... the indictment ... had charged that the defendant, being ... employe in ... the United States post office ..., embezzled the sum stated, and had further alleged that such sum came into his possession in that capacity, we should have held the indictment sufficient. . . ." 16 S.Ct. at 297.

3. The emergence of *Moore's* trust concept into an express provision of the present bank embezzlement statute was a gradual process. In the beginning the embezzlement proscription of R.S. 5209 extended only to the officers, employees and agents of national banking associations

and to the moneys, funds or credits of the association. The Act of September 26, 1918 amended R.S. 5209 expressly to prohibit any "receiver of a national banking association" from embezzling "moneys, funds or assets *of his trust.*" And embezzling "moneys, funds, or securities *intrusted to his care*" was proscribed for any agent or employee of the Federal reserve. 40 Stat. 972–73 (emphasis added). *Moore's* trust concept was expressly made applicable to employees of national banks by the Act of June 25, 1948, c. 645, 62 Stat. 683. The 1948 Act revised, codified and enacted into positive law those statutes designated as Title 18, United States Code, and entitled "Crimes and Criminal Procedure." In that 1948 codification § 656 attained its present form.

Illustrative of embezzlement involving a breach of trust without prior actual possession are those cases where an agent who is authorized to administer his principal's checking account makes unauthorized withdrawals and converts the funds to his own use. Although the agent comes into possession of the principal's funds only by an unauthorized act, the majority of these cases hold that the agent has nonetheless embezzled, because he had control over the funds by virtue of his position of trust. *See* Annot., 88 A.L.R.2d 688, 689 (1963) (cases in which accused made out checks to his own creditor). *E. g., Evans v. State,* 343 So.2d 557, 560 (Ala.Cr.App.1977) (employee who had authority to issue and sign checks on his employer's bank account drew check for his personal benefit). *Evans* indicates that money, the disbursement of which is entrusted to the defendant, is in his possession for purposes of embezzlement. The funds in such cases may be considered to be in the agent's constructive possession. It remains, therefore, that actual possession may not be required where funds are entrusted to the accused's care; and it may not be required that the accused come into the possession of the funds by an authorized act.[4]

In *State v. Lamb,* 125 N.J.Super. 209, 310 A.2d 102 (1973), the receiving clerk never had actual possession of the goods; nor was he authorized to sign false receipts. Yet the court held that he embezzled when he signed false receipts which enabled his friend to collect from the clerk's employer for goods the employer never received: "Even though the goods may still have been on the [delivery] truck at the time, defendant, nevertheless, was able to exercise a sufficient measure of control over them so as to be in constructive, if not actual, possession of the goods on behalf of his employer." *Id.* at 105. The court followed the *Moore* definition of embezzlement and affirmed the clerk's conviction.

In a Louisiana case the statute proscribed as embezzlement any state officer's conversion to personal use of public money "he is authorized to collect, or which may be entrusted to safe keeping or disbursement . . . ." This statute recognizes the trust theory. Defendant, a sheriff and tax collector, in effect made improper expense reimbursement requests which the parish treasurer routinely honored by issuing the sheriff checks that were drawn on the Sheriff's Salary Fund. Defendant averred he could not embezzle money he did not legally possess. The court answered that although the sheriff lacked physical possession or legal custody of the money in the salary fund, "for all practical purposes [he] was the legal possessor. He had and exercised exclusive control of it. . . . [U]pon the presentation of the Sheriff's warrant, regular on its face, a duty devolved upon the treasurer to pay it, provided there were funds in the amount sufficient therefor." *State v. Doucet,* 204 La. 79, 14 So.2d 917, 919 (1943).

*McGlothen v. Commonwealth,* 310 Ky. 48, 219 S.W.2d 1003 (1949) involved a defendant loan officer who conspired with an applicant to have the loan company issue a loan to a fictitious entity, with the two conspirators pocketing the loan proceeds. Defendant argued he had not embezzled because he obtained the proceeds from his employer unlawfully, with the intent to steal. The court disagreed, stating the "essential element [of embezzlement] is that the property came into [the accused's] possession by virtue of his agency." *Id.* at 1005. The underlying statute spoke of property in the employee possession or "placed in his care." *Id.* This is merely a different phrasing of *Moore's* requirement that the property be "entrusted."

Several Arizona decisions support the same theory. In *State v. McCormick,* 7

---

4. *Leonard v. State,* 249 Ind. 361, 232 N.E.2d 882 (1968), involved an attorney who misappropriated his client's money by putting his own name in the payee blank on a check signed by the client. The court held "access in a situation of confidence and trust [coupled] with an unlawful conversion of the goods by the entrusted party will sustain a conviction of em-

bezzlement." Id. 232 N.E.2d at 885. The underlying statute provided: "Every . . . attorney [who,] having access to control or possession of any money [of his employer] shall, while in such employment, [appropriate it to his own use] . . . shall be deemed guilty of embezzlement." To the same effect is *Young v. State,* 204 Ind. 331, 183 N.E. 100 (1932).

Ariz.App. 576, 442 P.2d 134 (1968), the court affirmed a grand theft conviction on, among others, the ground that the evidence supported a conviction of embezzlement which was one example of grand theft. Arizona statutorily defined embezzlement as fraudulent appropriation of property in one's possession or under one's control by virtue of his trust. This definition in its trust concept follows *Moore.* The defendant was president of a fraternal society and had authority, with the society's treasurer, to co-sign checks drawn on the society's bank account. The treasurer exercised no discretion, and the president wrote unauthorized checks to himself. The president's conviction of embezzlement was affirmed on the basis of his fiduciary relationship with the society: "As a consequence of such relationship, he obtained control of [the society's] funds on deposit. . . . Actual possession of the money was not essential—it was sufficient that it was under the defendant's control in the sense that it was under his direction or management." *Id.* at 141.

The same statutes were applied in *State v. Roderick,* 9 Ariz.App. 19, 448 P.2d 891 (1969). Defendant was authorized to buy a plane for resale. He asked the seller to rebate the dealer's discount in the form of a check payable to his order, and then pocketed the money instead of turning it over to his employer. Because defendant acquired the check under "color of authority (claiming to be [the buyer's] agent in procuring the discount)," he gained the property by virtue of his trust, and by the misappropriation committed embezzlement. *Id.* at 894.

More recently, in *State v. Malory,* 113 Ariz. 480, 557 P.2d 165 (1976), a bookkeeper had authority to fill in the name of the payee in checks signed by the corporate officers in blank. Then after procuring the signatures of trusting corporate officers she filled in her own name instead. Defendant argued she had not embezzled because she obtained possession of the signed checks (and thus the money) not lawfully but by

fraud. Rejecting this argument, the court held it was enough for embezzlement under Arizona law that defendant had control of the property by virtue of a trust relationship; she was able to perpetrate her scheme because her two years of responsible service induced the officers to trust to the honest performance of her duties. *Id.* at 167–68.

The Idaho Supreme Court relied on a similar analysis in *State v. Lockie,* 43 Idaho 580, 253 P. 618 (1927), in which an employee falsified expense accounts and drew checks on the company's bank account in amounts greater than his actual expenses. The defendant emphasized that he had gained possession of the money by trick or fraud or trespass, and argued that his crime, if any, was therefore larceny rather than embezzlement. The court first opined that defendant's argument would be flawed even under a statute requiring actual prior possession, for the defendant might be estopped to assert his possession was unlawful.[5] The court then relied on the Idaho statute, which stated that property is subject to embezzlement if it has come into the defendant's "control or care by virtue of his employment . . . ." That was the case in *Lockie,* for

> [t]he property of the company, namely, its credit with the bank, was by virtue of defendant's employment subject to his check, and was thus within his care and control . . . . There is no limitation upon the manner in which he may have obtained it, if he controls it by virtue of his employment.

This is nothing more than another application of the trust theory.

### III

The foregoing representative cases strongly suggest that the common meaning of embezzlement is at least as broad as the *Moore* definition of 1895 and includes the aspect of control by virtue of a *position of special trust.* This kind of control may

---

5. Estoppel theory, like the notion of constructive possession, is a familiar way to satisfy the requirement of actual prior possession for embezzlement. See *Drake v. State,* 53 Ariz. 93, 85 P.2d 984, 987 (1939), where defendant was held estopped to deny his prior lawful possession of property he had acquired under color of authority.

exist apart from the element of "prior lawful possession," as witnessed by the statutes specifying "*possession or control.*" Or it may exist as a concept subsumed within "possession," as in those cases which speak of "constructive possession" as a sort of synonym for defendant's control, and in those cases where the defendant is estopped to deny prior possession because he had gained possession under color of authority.

Some cases tend to support a narrow, technical construction of embezzlement. Dictum in *Rohde v. United States,* 34 App. D.C. 249 (1910), for example, emphasizes possession: the embezzler "commits no trespass or wrong in acquiring the possession, but a breach of trust in converting the property to his own use." *Id.* at 253 (cited in Maj. op. at 1098 n.28). And dictum in *United States v. Orbiz,* 358 F.Supp. 200, 203 (D.P.R.1973) (Maj. op. at 1098 n.31) defines embezzle for § 656 purposes as taking property "which came into the wrongdoer's possession lawfully by virtue of his office of employment or position of trust with the bank." This definition, too, seems to make prior lawful possession an essential element but does incorporate the "trust" concept. A third case is *United States v. Breese,* 173 F. 402 (C.C.W.D.N.C.1909) (cited at 1098 n.31). There the court instructed the jury that embezzlement "is a breach of trust ... with respect to moneys ... in possession of a party *and* entrusted to him by another ...." *Id.* at 405–06 (emphasis added). *Breese* thus conjoins what *Moore* identifies as the disjunctive elements of (1) property entrusted (property under control by virtue of trust) and (2) property in actual prior lawful possession.

In *United States v. Harper,* 33 F. 471 (C.C.S.D.Ohio 1887) (cited at 1098 n. 31), however, the jury instructions recognized a broader conception of embezzlement. There, in the trial of a bank vice-president for embezzlement under § 656's predecessor, R.S. § 5209, embezzlement was said to require "actual and lawful possession *or custody* ... by virtue of some trust ...." The court further stated that it was not necessary that defendant's custody or possession be exclusive. The subsequent taking would constitute embezzlement if the assets of the bank were actually or *practically* entrusted to the care and management of the defendant, so that, by virtue of his position ...., he had not merely access to, or a constructive possession of, but such actual custody of the funds as enable him to have and exercise control over the same.

*Id.* at 475–76 (emphasis added).

*Virgin Islands v. Leonard,* 548 F.2d 478 (3d Cir. 1977), and *United States v. Sayklay,* 542 F.2d 942 (5th Cir. 1976) are closest on the facts to the present case. In *Leonard,* the defendant was a civil defense storeroom employee who entered his employer's office at night, took the storeroom keys from a universally known location, and stole chicken wire. The court reversed defendant's embezzlement conviction under a statute covering property in a public officer's possession or under his control "by virtue of his trust." 548 F.2d at 480. The chicken wire was not under defendant's prior control because he had no authority to exercise any dominion over the contents of the storeroom. He was like any other employee (including secretaries and part-time help) in knowing where the storeroom keys were, and he came into the storeroom (not under any color of authority but) like "a thief in the night." *Id.*

*Leonard* is distinguishable from the present case because the *Leonard* defendant was like a janitor, as the court noted; he was not in a high position of trust as was Whitlock as an assistant cashier and assistant manager with the special trust powers that gave her access to the keys, the combination and the money. The *Leonard* defendant did not, like Whitlock, act under color of authority in getting access to the converted property. See also *Warren v. State,* 223 Ind. 552, 62 N.E.2d 624 (1945) (warehouseman who used his key to open warehouse and steal material is guilty of larceny rather than embezzlement; his was not a special position of trust).

In *United States v. Sayklay, supra,* the bank bookkeeper was able to perpetrate a

check fraud through her access, as bookkeeper, to a check encoding maching and blank checks. The *Sayklay* court held it was not enough that the defendant is entrusted with all the tools necessary to gain access to the funds; the defendant must be entrusted with the funds themselves, as a bank teller or bank president is. Whitlock differs from the *Sayklay* bookkeeper both in the degree of trust placed in her and in the fact that the bookkeeper had to perform an intervening unlawful act—fraudulent check encoding—whereas Whitlock here got her hands on the money simply by exercising her prerogatives as a bank officer and the access that she was given by virtue of her special trust duties.

## IV

This brings us to Whitlock's access to and authority and control over the money. Appellant attempts to play down her role of authority at the bank by terming herself a "note officer." Actually she was much more. She was an "assistant cashier and assistant manager" (Tr. 18, 33), and necessarily had the authority and access within the bank that goes with those positions. In particular, she occupied a special position of trust along with two other bank officers who had the *keys* to the reserve vault (Tr. 18). Through these keys money could be obtained from the vault in conjunction with the manager who had memorized the combination thereto. Both the keys and the combination were necessary for a person to reach the money. However, the manager also kept the combination in an envelope in a separate "manager's vault" and Whitlock and the other two officers did "know about the combination being in the manager's vault." (Tr. 19). They were entrusted with such knowledge as part of their special duties. In the manager's absence "they use the combination." (Tr. 20). "Any one of the [three] bank officers . . . had *access* . . . to that piece of paper inside the manager's

vault that had the combination." (Tr. 21) (emphasis added). Thus, although this plan was designed to place the reserve vault cash under "dual control" (Tr. 18), in practice the plan provided each of the key-bearing officers with single access and control: any one of the three could exercise his or her access to the combination and combine it with use of the key. Under such circumstances the district court was clearly entitled to find that Whitlock was effectively *entrusted* with the combination to the safe as well with the keys.

It therefore appears that, by virtue of Whitlock's position of trust as Assistant Cashier and Assistant Manager, and the special access she was given to the key and the combination, the funds in the vault were under her effective control. Upon such undisputed facts it must be concluded that Whitlock was one of the "person[s] to whom such [money] ha[d] been *intrusted* . . ." and she committed an embezzlement in converting it to her own use. This conclusion follows from the meaning of embezzlement current at least since the decision in *Moore* and is enforced by the amended present language of the statute, which precisely, if redundantly, covers the situation of a bank "officer . . . [or] employee [who] . . . embezzles . . . moneys . . . *intrusted* . . . to the custody or care of such . . . officer [or] . . . employee." (Emphasis added). For the foregoing reasons it is my opinion that Whitlock was guilty not only of the included offense of willful misapplication but also of embezzlement. Judge Robb joins in this opinion affirming the conviction of embezzlement.